567 F.2d 994
 10 ERC 1916, 186 U.S.App.D.C. 1, 8
Envtl. L. Rep. 20,037
 ASPHALT ROOFING MANUFACTURERS ASSOCIATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Atchison, Topeka and Santa Fe Railroad Co. et al., Eastern
Railroads of the U. S., Fertilizer Institute et
al., Intervenors.*
SOUTHERN FOREST PRODUCTS ASSOCIATION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, Topeka and Santa Fe Railroad Co. et al., Eastern
Railroads of the U. S., Fertilizer Institute et
al., Intervenors.
SUNKIST GROWERS, INC., et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Atchison, Topeka and Santa Fe Railway Co., Fertilizer
Institute et al., Intervenors.
UNITED STATES BEET SUGAR ASSOCIATION et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Eastern Railroads, Atchison, Topeka and Santa Fe Railway
Co., Fertilizer Institute et al., Intervenors.
AMERICAN FROZEN FOOD INSTITUTE, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Eastern Railroads, Certain-Teed Products Corporation,
Atchison, Topeka and Santa Fe Railway Co.,
Fertilizer Institute et al., Intervenors.
VOLKSWAGEN OF AMERICA, INC., Petitioner,
v.
The UNITED STATES of America and the Interstate Commerce
Commission, Respondents,
Atchison, Topeka and Santa Fe Railway Co., Eastern
Railroads, Fertilizer Institute et al., Intervenors.
FORD MOTOR COMPANY, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, Topeka and Santa Fe Railway Co., Fertilizer
Institute et al., Intervenors.
GENERAL MOTORS CORPORATION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, Topeka and Santa Fe Railroad Co. et al.,
Fertilizer Institute et al., Intervenors.
AMERICAN MOTORS CORPORATION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Fertilizer Institute et al., Intervenors.
WESTERN GROWERS ASSOCIATION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Eastern Railroads Atchison, Topeka and Santa Fe Railway Co.,
Fertilizer Institute et al., Intervenors.
 Nos. 75-1641, 75-1716, 75-1760, 75-1768, 75-1779, 75-1833,
75-1893 to 75-1895 and 75-1937.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 24, 1977.
Decided Oct. 17, 1977.
As Amended Oct. 20, 1977.
Rehearing Denied Jan. 5, 1978.
 
 William Q. Keenan, New York City, with whom Charles J. McCarthy, Washington, D. C., was on the briefs, for petitioners in Nos. 75-1641 et al., No. 75-2028 and No. 75-2029. Henry M. Wick, Jr., Charles J. Streiff, Pittsburgh, Pa., Dickson R. Loos, Barry Roberts, John A. Whitney, Washington, D. C., A. Wallace Tashima, Los Angeles, Cal., Richard E. Costello, New York City, Frederick L. Wood, Jackson, Mich., Martin J. Leavitt, Northville, Mich., Walter Vashak, David R. Larrouy, Dearborn, Mich., Benson T. Buck, Anthony A. Haisch, Jay A. Herbst, Detroit, Mich., and Jeffrey Lee Guttero, Newport Beach, Cal., were on petitioners' joint brief on common issues in Nos. 75-1641 et al.
 Howard Gould, Cincinnati, Ohio, with whom David Reichert and Stephen D. Strauss, Cincinnati, Ohio, were on the brief, for petitioner in No. 75-1982.
 Edward L. Merrigan, Washington, D. C., for petitioners in Nos. 75-1255 and 75-2022.
 John A. Whitney, Washington, D. C., with whom Dickson R. Loos, Washington, D. C., was on the brief, for petitioners in No. 75-1760. Barry Roberts, Washington, D. C., also entered an appearance for petitioners in No. 75-1760.
 Peter A. Fitzpatrick, Asst. Gen. Counsel, I. C. C., Washington, D. C., for respondent, I. C. C., and John Osborn, Atty., Dept. of Justice, for respondent, U. S., in Nos. 75-1641 et al.
 Charles H. White, Jr., Associate Gen. Counsel, I. C. C., Washington, D. C., for respondents in Nos. 75-2028, 75-1255 and 75-2022.
 Hanford O'Hara, Associate Gen. Counsel, I. C. C., Washington, D. C., for respondents in Nos. 75-1982 and 75-2029.
 Richard J. Flynn, Washington, D. C., with whom Joseph B. Tompkins, Jr., and R. Eden Martin, Chicago, were on the brief, for intervenors Western and Southern Railroads in Nos. 75-1641 et al. and No. 75-2028. Peter J. Vaghi, Washington, D. C., was also on the brief for intervenors in No. 75-2028. John E. Haley, Washington, D. C., also entered an appearance for intervenors in Nos. 75-1641 et al.
 John A. Daily, Philadelphia, Pa., with whom Edward A. Kaier, Philadelphia, Pa., was on the brief, for intervenors Eastern Railroads in Nos. 75-1641 et al., 75-2028, 75-1982 and 75-2029.
 Michael Boudin, Washington, D. C., with whom Charles A. Horsky, Arthur F. Fergenson, John A. Daily, Washington, D. C., and Thormund A. Miller, San Francisco, Cal., were on the brief, for intervenors Aberdeen and Rockfish Railroad Co., et al., in Nos. 75-1255 and 75-2022.
 Henry M. Wick, Jr., Charles J. Streiff, Pittsburgh, Pa., Charles W. Chapman, Washington, D. C., and Frederic L. Wood, Washington, D. C., were on the brief for petitioners in No. 75-1716.
 A. Wallace Tashima, Los Angeles, Cal., and Richard E. Costello, New York City, were on the brief for petitioners in No. 75-1768.
 Donald G. Dressler and Jeffrey Lee Guttero, Newport Beach, Cal., were on the brief for petitioners in No. 75-1937.
 John F. Donelan, Washington, D. C., and Frederic L. Wood, Washington, D. C., were on the brief for petitioner in No. 75-1779.
 Jay A. Herbst, Detroit, Mich., was on the brief for petitioner in No. 75-1895.
 David Larrouy and Walter Vashak, Dearborn, Mich., were on the brief for petitioner in No. 75-1893.
 Martin J. Leavitt, Northville, Mich., was on the brief for petitioner in No. 75-1833.
 Benson T. Buck, Detroit, Mich., was on the brief for petitioner in No. 75-1894. Leonard F. Charla, Fairfield, N. J., also entered an appearance for petitioner in No. 75-1894.
 Arthur J. Cerra, Gen. Counsel, I. C. C., Hanford O'Hara, Associate Gen. Counsel, I. C. C., Carl D. Lawson and John J. Powers, III, Attys., Dept. of Justice, were on the brief for respondents in Nos. 75-1641 et al. John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondent United States of America in Nos. 75-1641 et al., No. 75-2028 and Nos. 75-1982 and 75-2029.
 Robert S. Burk, Acting Gen. Counsel, and Hanford O'Hara, Associate Gen. Counsel, I. C. C., Washington, D. C., were on the brief for respondent I. C. C. in No. 75-2028. Carl D. Lawson and Lloyd John Osborn, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondent United States of America in No. 75-2028, Nos. 75-1982 and 75-2029 and Nos. 75-1255 and 75-2022.
 Arthur J. Cerra, Gen. Counsel, Charles H. White, Jr., Associate Gen. Counsel, and Peter A. Fitzpatrick, Asst. Gen. Counsel, I. C. C., Washington, D. C., were on the brief for respondents in Nos. 75-1982 and 75-2029.
 Peter R. Taft, Asst. Atty. Gen., Arthur J. Cerra, Gen. Counsel, Fritz R. Kahn, Gen. Counsel, I. C. C., at the time the brief was filed, Washington, D. C., and Larry G. Gutterridge and Edmund B. Clark, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents in Nos. 75-1255 and 75-2022. Wallace H. Johnson, Asst. Atty. Gen. at the time the record was filed, Washington, D. C., Peter H. Fitzpatrick, Asst. Gen. Counsel, I. C. C., and Carl Strass, Atty., Dept. of Justice, Washington, D. C., also entered appearances for respondents in Nos. 75-1255 and 75-2022.
 Joel S. Moskowitz, Deputy Atty. Gen., State of Cal., Sacramento, Cal., filed a brief on behalf of the People of the State of Cal. and Cal. State Solid Waste Management Bd. as amicus curiae, urging reversal, in Nos. 75-1255 and 75-2022.
 John D. Conner, Washington, D. C., entered an appearance for intervenors The Fertilizer Institute and The Canadian Fertilizer Institute in Nos. 75-1641 et al., and No. 75-2028.
 Charles W. Chapman, Washington, D. C., also entered an appearance for intervenor Certain-Teed Products Corp. in No. 75-1779.
 Before Mr. Justice CLARK,* of the Supreme Court of the United States, and MacKINNON and ROBB, Circuit Judges.
 Opinion for the court PER CURIAM.
 
 PER CURIAM:
 
 1
 This proceeding, in which the petitioners are shippers, involves four separate cases,[1] three of which are consolidated actions, each seeking review of Interstate Commerce Commission (ICC) orders entered in connection with several railroad rate increases. Two of the increases are challenged on predominantly economic grounds, three largely on environmental ones, and two on both economic and environmental bases.
 
 
 2
 Under the Interstate Commerce Act (The Act) the initiative in rate-setting is vested in the railroads with the ICC holding the power to declare a rate unlawful if it finds it unjust, unreasonable, preferential, discriminatory, or otherwise in violation of the Act. 49 U.S.C. §§ 13 and15 (1970). Moreover, the ICC has the sole power to suspend a new rate for a maximum of seven months pending the Commission's determination of its lawfulness, 49 U.S.C. § 15(7). If a single commodity is involved, the investigation, if undertaken, will be limited to the justness and reasonableness of the rate proposed. However, if the increase is across-the-board, the ICC need not consider each product separately, but may find the new rates lawful after taking proof relating to the reasonableness of the increase in general, New England Divisions Case, 261 U.S. 184 (1923), or by declining to declare it unlawful following investigation, United States v. Louisiana,290 U.S. 70 (1933). This latter procedure has since become known as a general revenue proceeding.
 
 
 3
 The ICC's inquiry primarily focuses on whether railroads are truly in need of increased revenues, leaving determinations as to individual commodities to individual rate or refund proceedings under 49 U.S.C. §§ 13 and 15. Let us now turn our attention to the orders challenged for lack of economic justification.
 
 I. ECONOMIC ISSUES
 A. The Nature of the Revenue Orders
 
 4
 The general revenue orders are under attack for lack of economic justification: (1) Ex Parte No. 310, Increased Freight Rates and Charges, 1975, Nationwide, (2) Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974,[2] and (3) Ex Parte No. 313, Increased Freight Rates and Charges Labor Costs, 1975.
 
 
 5
 Ex Parte No. 310. On November 15, 1974, the railroads filed for permission to increase rates and charges by 7% Effective immediately without suspension by the ICC. The latter ordered an investigation on November 27, 1974, and in the same order also authorized an increase not to become effective before February 5, 1975. The order further reserved the right to prohibit, modify or suspend the increase prior to that date, accepted railroad evidence in support of the increase, sought evidence from protesting shippers, and scheduled hearings on the proposed increase.
 
 
 6
 The hearings resulted in suspension of Ex Parte No. 310 on January 29, 1975, for a seven-month period, but with a number of important exemptions, known as "holddowns"[3] and "flag-outs."[4] Ex Parte No. 310 became effective on April 27, 1975, but motor vehicles, asphalt building and roofing materials, sugar beets, lumber, frozen foodstuffs, fresh fruits, fresh vegetables, and canned foodstuffs were specifically exempted by an order dated March 21, 1975. The railroads petitioned for reconsideration of these holddowns, which relief the Commission granted on June 10, 1975. Requests for reconsideration of the June 10 order by shippers were denied on September 9, 1975.
 
 
 7
 Ex Parte No. 305. On April 22, 1974, the Nation's railroads petitioned the ICC for permission to increase freight charges by 10%, effective May 2, 1974, based on the need to update rights of way and rolling stock. Various shippers filed protests against the increase, but the ICC authorized the railroads to file tariffs and supplements implementing the increase on thirty days' notice subject to protest and suspension.
 
 
 8
 The Commission issued an order suspending the increase on its effective date, June 3, 1974, but authorized the filing of a new increase incorporating conditions whereby some 70% Of the increased rates would be used for capital expenditures. Pursuant thereto, the railroads filed a new increase on June 5, 1974, which was allowed to become effective without investigation or suspension.
 
 
 9
 Ex Parte No. 313. On April 29, 1975, 419 railroads sought ICC permission to file two tariffs increasing freight rates and charges to cover already bargained and scheduled railroad wage increases. The first tariff was to become effective May 28, 1975 (5% Increase) and the second on October 1, 1975 (2.5% Increase). Following Commission consideration of both railroad and shipper evidence, the 5% Increase was granted on June 5, 1975, and the 2.5% Increase followed on September 26, 1975, both without investigation or suspension.
 
 B. Reviewability in General
 
 10
 The various parties to this action offer sharply divergent views as to the reviewability of the Commission's orders. The petitioners argue that all of the ICC orders at issue in these cases are reviewable, while the respondent-intervenor railroads contend that none of the orders is reviewable on the economic issues. The Commission and the United States both submit that the Commission's decision not to suspend a proposed general rate increase is not reviewable, while its orders entered after a full investigation of the issue of general revenue need are immediately reviewable. The United States and the Commission, however, part company as to the reviewability of an ICC decision not to investigate a proposed general rate increase. The United States contends that such decisions are reviewable, while the Commission argues that they are not.
 
 
 11
 The parties arguing that the orders are to some extent unreviewable base their positions on lines of authority originating with the three-judge court decision in Algoma Coal & Coke Co. v. United States, 11 F.Supp. 487 (E.D.Va.1935). In Algoma, the Commission instituted an investigation of general rate increases filed by the railroads, but did not suspend the rates. As a result of the investigation, the Commission determined to allow the rates to remain in effect for a period. The three-judge court held that the Commission's decision was unreviewable, basing this holding on its conclusions (1) that the Commission had never finally determined the legality of the proposed rates as they affected the particular commodities shipped by the petitioners, and that therefore the shippers' proper remedy was to seek a refund under 49 U.S.C. §§ 13 and 15; and (2) that the Commission's decision was in effect one not to suspend the proposed general rate increase, which power was vested solely in the Commission and not subject to judicial review.
 
 
 12
 The premise underlying the Algoma court's second conclusion is now firmly established: The Commission's decision on whether to suspend a proposed general rate increase is committed solely to the agency's discretion and is unreviewable by the courts. United States v. SCRAP, 412 U.S. 669, 690-98, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (SCRAP I ); Arrow Transportation Co. v. Southern Ry., 372 U.S. 658, 662-68, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); Board of R. R. Comm'rs v. Great Northern Ry., 281 U.S. 412, 429, 50 S.Ct. 391, 74 L.Ed. 936 (1930); Port of New York Authority v. United States, 451 F.2d 783 (2d Cir. 1971); Oscar Mayer & Co. v. United States, 268 F.Supp. 977 (W.D.Wis.1967) (three-judge court); Luckenbach Steamship Co. v. United States, 179 F.Supp. 605 (D.Del.1959) (three-judge court), aff'd mem. in part, vacated in part, 364 U.S. 280, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960).
 
 
 13
 Where shippers have challenged the Commission's decision, after suspension and investigation, to permit a general rate increase to go into effect, but have based their challenge only upon the unreasonable effect of the rate increase upon a particular commodity, three-judge courts have followed the first holding in Algoma and held that the shippers must first exhaust their administrative remedies under 49 U.S.C. §§ 13 and 15. See Electronic Industries Ass'n v. United States, 310 F.Supp. 1286 (D.D.C.1970) aff'd mem., 401 U.S. 967, 91 S.Ct. 1188, 28 L.Ed.2d 318 (1971); Florida Citrus Comm'n v. United States, 144 F.Supp. 517 (N.D.Fla.1956) aff'd mem., 352 U.S. 1021, 77 S.Ct. 589, 1 L.Ed.2d 595 (1957); Koppers Co. v. United States, 132 F.Supp. 159 (W.D.Pa.1955). Two three-judge courts, going beyond the facts underlying the second Algoma holding, but relying upon the reasoning of that decision, have held that shippers seeking to challenge even the Commission's conclusion that rate increases were justified in general must first exhaust their administrative remedies under 49 U.S.C. §§ 13 and 15. Alabama Power Co. v. United States, 316 F.Supp. 337 (D.D.C.1969), and Atlantic City Elec. Co. v. United States, 306 F.Supp. 338 (S.D.N.Y.1969), both aff'd mem. by an equally divided Court, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970).
 
 
 14
 The Supreme Court in Aberdeen & Rockfish R.R. v. SCRAP, 422 U.S. 289, 314-18, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975) (SCRAP II ), recounted this history but expressly declined to resolve the issue whether an ICC "decision that a general rate increase is justified by reason of revenue need is a final decision ripe for immediate review . . . absent exhaustion of § 13 remedies . . .." 422 U.S. at 317-18, n.18, 95 S.Ct. at 2354 (emphasis by the Court). The Court in SCRAP II did, however, hold that the Commission's conclusion at the close of a general revenue proceeding "that it need give no further consideration to environmental factors "under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-35 (1970) in that proceeding " was a final decision subject to judicial review, 422 U.S. at 318-19, 95 S.Ct. 2336 (emphasis by the Court).
 
 C. Ex Parte Nos. 305 and 313
 
 15
 The orders challenged in each of these proceedings permitted rates filed by the railroads to go into effect without either investigation or suspension. It is firmly settled that ICC orders suspending rate increases for the statutory period are within the agency's sole discretion and are judicially unreviewable. See Part IA supra. The United States and the petitioners urge that a distinction should be drawn between Commission orders refusing to suspend rate increases and those declining to institute an investigation; the latter, they argue, should be held reviewable. The basic difficulty with this argument is that section 15(7), which empowers the Commission both to suspend and to investigate proposed rate increases, grants both powers in substantially the same language. There is therefore no ground, on the basis of the Act, for treating the two powers differently for purposes of reviewability. We hold that the reviewability of the Commission's decision to permit the rate increases in these proceedings to go into effect without suspension or investigation is controlled by the cases holding the Commission's decision whether to suspend a rate increase to be unreviewable.
 
 D. Ex Parte No. 310
 
 16
 Various of the petitioners challenge the Commissioner's orders in this proceeding lifting the holddowns on particular commodities. Our review of the statutory scheme and the case law convinces us that these challenges are properly addressed to the Commission in administrative proceedings under 49 U.S.C. §§ 13 and 15. See, e. g., Electronic Industries Ass'n v. United States, supra.
 
 
 17
 Other petitioners challenge the Commission's conclusion in this proceeding that the rate increases were supported by the railroads' general revenue need. These petitioners, with whom the United States and the Commission itself join on this point, thus urge us to reach the issue reserved by the Supreme Court in SCRAP II, and to adopt the conclusion of Judge Wright's dissent in Alabama Power, 316 F.Supp. at 339-40, that a Commission determination of overall revenue need in a general revenue proceeding is ripe for judicial review. In the context of the present case, however, we need not resolve this issue.
 
 
 18
 Whether or not the Commission's determination of general revenue need is properly reviewable, which we do not decide, it is clear on the present record that its decision in this proceeding rested firmly upon a rational basis.[5] The evidence presented paints a bleak financial picture of the railroad industry. While the statistics offered by the petitioners indicate that some railroads are not in as deep a financial hole as others,[6] we agree with the respondents' statement that, "The most which can be said about this use of statistics is that, in an across-the-board increase such as Ex Parte 310, certain railroads will profit more from the increase than others." Poorer railroads could hardly charge higher rates if the better-heeled railroads were undercutting them.
 
 
 19
 The basic problem with the petitioners' argument here is that it overlooks the status of the railroad industry as a whole, a status which is far from solid. The need for continuing huge capital expenditure outlays faces even the most affluent of railroads. Similarly, the enormous increases in fuel costs threaten to cripple the industry. Granting the 7% General rate increase cannot be characterized as arbitrary and capricious ICC action; rather it is apparent that the order authorizing the increase has a rational basis.
 
 
 20
 Since it is clear in this case that the Commission's orders rested upon a rational basis, we choose to dispose of the case on this basis and reserve the ultimate issue of reviewability for another day.
 
 II. ENVIRONMENTAL ISSUES
 
 21
 Two separate actions are involved here: National Association of Recycling Industries, Inc. v. United States, et al., No. 75-1255 (NARI I ) and 75-2022 (NARI II ). NARI I seeks review of Commission orders entered in three separate general revenue proceedings: (1) Ex Parte No. 295 (Sub No. 1), Increased Freight Rates and Charges, 1973-Recyclable Materials, (2) Ex Parte No. 299, Increases in Freight Rates and Charges to Offset Retirement Tax Increases 1973 and (3) Ex Parte No. 303, Increased Freight Rates and Charges, 1974, Nationwide. NARI II seeks review of Commission orders entered in Ex Parte No. 313, Increased Freight Rates and Charges Labor Costs 1975 and Ex Parte No. 305 RE, Increased Freight Rates and Charges 1974. The petitioners argue that the Commission's actions in these general revenue proceedings failed "to the fullest extent possible" to satisfy the Environmental Impact Statement (EIS) Requirements of section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C) 1970. The Commission's conclusion at the close of a general revenue proceeding that it need take no further actions to comply with NEPA was squarely held to be a final reviewable decision in SCRAP II, 422 U.S. at 318-19, 95 S.Ct. 2336, discussed in Part I.B, supra.
 
 A. The Increases
 
 22
 Ex Parte No. 295 (Sub No. 1). In April 1973, virtually all of the Nation's railroads requested ICC authority to file a tariff embodying a general rate increase of 5%.[7] When filed, there was uncertainty arising out of a three-judge court's injunction against the collection of a rate increase on recyclables authorized by the Commission in an earlier general revenue proceeding.[8] As an appeal of this injunction was pending in the Supreme Court at the time the railroads initiated Ex Parte No. 295, the railroads voluntarily excluded recyclable commodities from the proposed rate increase as a precautionary measure.
 
 
 23
 In June 1973, the Supreme Court held the three-judge court to be without power to enjoin the collection of the authorized rate increase for recyclables in SCRAP I.
 
 
 24
 In August 1973, the ICC authorized an interim general revenue increase of 3% In Ex Parte No. 295. Further, in light of SCRAP I and the interim increase, the railroads petitioned the ICC for permission to raise rates on recyclables. This proceeding was denominated "Ex Parte No. 295 (Sub No. 1)."
 
 
 25
 The Commission suspended the proposed recyclables tariffs for seven months and served its final report and order with a comprehensive final environmental impact statement on October 1, 1974. The Commission concluded that the 3% Increase on transportation rates would not have a significant effect on the quality of the human environment. Several petitions for reconsideration were denied in January 1975, and the authorized recyclables rate increase was brought into parity with the overall rate increase of Ex Parte No. 295.
 
 
 26
 The EIS for Ex Parte No. 295 (Sub No. 1) was jointly prepared by the ICC and the Mitre Corporation, a consulting agency which does $60 million a year in federal business. Although the bulk of Mitre's business was done for the Air Force, it had done work for a number of other federal agencies. This was the first EIS it had developed, as well as its first exposure to railroad rate work.
 
 
 27
 Hearings were held for three days on the draft EIS with staff members from Mitre available for cross-examination.
 
 
 28
 The ICC's final report and order, as well as its final EIS were filed on October 31, 1974. The EIS analyzed the recycling market and technology for aluminum, copper, lead, nickel, zinc, cullet (recyclable glass), blast furnace and coke oven products, ashes, rubber and plastic scrap and waste, reviable plastics, recyclable paper, textile wastes and ferrous scrap. The final report determined that the railroads had shown a need for the 3% Increase on transportation rates of recyclable commodities, and that the increase should not have a significant effect on the quality of the human environment.
 
 
 29
 Ex Parte No. 299. In July 1973, Congress amended the Railroad Retirement Act increasing the retirement tax liabilities on the railroads. As a companion to that action, the Interstate Commerce Act was amended to provide for the prompt pass-through of the increased tax liability by means of increases in the general rate level, Railroad Rate Adjustment Act of 1973, 49 U.S.C. § 15a (Supp. V 1975). The ICC then established new procedures to expedite the railroads' rate adjustments to effect the additional retirement tax obligations.
 
 
 30
 Following this action, the railroads filed a series of general revenue increases aggregating 2.9% To effect corresponding increases in their retirement tax obligations. The ICC authorized a 2.8% Increase for this purpose on an interim basis. In August 1975, five months after the petitioner filed NARI I, the ICC issued its final report and order approving a general revenue increase of 2.8% To offset the retirement tax increase.
 
 
 31
 Ex Parte No. 303. In December of 1973, the railroads sought permission for a general revenue hike of 5%. An investigation was initiated and an interim increase of 4% Was authorized. Recyclable commodities were excepted because the Ex Parte No. 295 (Sub No. 1) environmental analysis was still underway.
 
 
 32
 After the environmental study was completed, the ICC determined that this increase would not have a significant environmental impact and lifted its exception on recyclables, authorizing a 4% General revenue increase.
 
 
 33
 An Environmental Threshold Assessment Survey (TAS) draft incorporating an examination of the rate structure was prepared. Because both Ex Parte No. 299 and 303 were initiated during the environmental study in Ex Parte No. 295 (Sub No. 1), the ICC considered the cumulative impact of Ex Parte 299 and 303 (a total rate hike of 6.8%) in preparing the TAS draft. Upon completion, the draft was circulated to all parties and appropriate agencies.
 
 
 34
 The final TAS was prepared following input from these parties and agencies, and concluded that the increases would not significantly affect the human environment.
 
 B. The Issues
 
 35
 NARI I raises two basic issues: (1) should the ICC have prepared an EIS prior to granting rate increases in Ex Parte Nos. 299 and 303, which rate increases affect the recyclable commodities industry; and (2) did the ICC violate NEPA by hiring the Mitre Corporation to prepare an EIS for Ex Parte No. 295 (Sub No. 1).
 
 
 36
 NARI asserts that the NEPA mandates ICC preparation of an EIS for rate increases involving recyclable commodities, citing SCRAP II. However, an EIS is required only where the rate proceeding "significantly affect(s) the quality of human environment." 42 U.S.C. § 4332. See SCRAP II, 422 U.S. at 318-319, 95 S.Ct. 2336. "The agency has the authority to make its own threshold determination." Morningside Renewal Council v. Atomic Energy Commission, 482 F.2d 234, 238 (2d Cir. 1973), cert. denied, 417 U.S. 951, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). When the agency determines that such an impact statement is unnecessary, it must give a statement of its reasons, and where the agency's statement of explanation is sufficient, the NEPA criteria are satisfied. Arizona Public Service Co. v. Federal Power Commission, 160 U.S.App.D.C. 215, 490 F.2d 783 (1974).
 
 
 37
 Our review of the record satisfies us that the ICC's "threshold determination" of the environmental impact of the Ex Parte Nos. 299 and 303 rate increases is sufficiently documented in the TAS, to be in compliance with the NEPA. Therefore, the Commission did not need to prepare a full-blown EIS.
 
 
 38
 Looking now at the allegations concerning the Mitre Corporation, NARI asserts that the Commission failed to satisfy its duty to prepare an EIS under section 102(2)(C) when it hired Mitre to assist in its preparation. Petitioner argues both that the Commission failed to participate sufficiently in the EIS-drafting process, and that Mitre's lack of prior experience in environmental studies on rate impact on various industries rendered the EIS invalid.
 
 
 39
 However, we note that not only can the Commission use outside consultants in an EIS preparation, but that 40 C.F.R. § 1500 (1976) requires the use of such consultants. While we are aware of Mitre's inexperience in these areas, our review of the EIS and the record shows that it was not a "one-man show" as the NARI would have us believe. Rather, it is apparent that the Commission worked very closely with Mitre in the EIS's preparation, laying down the scope of Mitre's activities, adding the ICC's expertise in rate proceedings to the statement, reviewing the work product and revising both substance and form. The resulting EIS was quite adequate to satisfy the criteria of the NEPA.
 
 
 40
 NARI I presents us with several other points, none of which merits extended discussion. Petitioners argue that the Commission abused its discretion by approving general rate increases in Ex Parte Nos. 295 (Sub No. 1), 299, and 303 without first taking action to investigate and modify the base rate structure governing shipment of recyclable waste paper, textile wastes, and nonferrous metal scrap. In a related argument, petitioners contend that the Commission's orders, by failing to consider the effect of the cumulative rate increases upon recyclables, violate the "spirit" of the Regional Rail Reorganization Act of 1973, Pub.L.No.93-236, § 603, 87 Stat. 1023, read together with the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No.94-210, § 204, 90 Stat. 40, and the National Environmental Policy Act of 1969. We note that the Commission has promulgated rules to improve procedures for consideration of possible discrimination against recyclable commodities. Ex Parte No. 306, Implementation of Public Law 93-236 Freight Rates for Recyclables, 346 I.C.C. 408 (1974). The Commission has also undertaken studies relating to the shipment of recyclable commodities in Ex Parte 270 and Ex Parte No. 319, Investigation of Freight Rates for the Transportation of Recyclable or Recycled Materials. One Report has already been published, Ex Parte No. 270 (Sub No. 6), Investigation of Railroad Freight Rate Structure Scrap Iron and Steel, 345 I.C.C. 867 (1976). To the extent petitioners actually challenge the validity of the Commission's rules issued July 30, 1974, in response to the 1973 Act, their petitions are barred by the Hobbs Act's 60-day limitations period, 28 U.S.C. § 2344 (1970), made applicable to such rules by Pub.L.No.93-584, 88 Stat. 1917 (1975), as codified, 28 U.S.C. §§ 2321, 2341, 2342 (Supp. V 1975). To the extent petitioners' claim can be characterized simply as a challenge to the validity of the orders in the general revenue proceedings, we nevertheless decline to adopt their imaginative reading of the statutes. The Commission has neither acted contrary to law nor abused its discretion in electing to consider the underlying question of the rate structure for recyclables in proceedings separate from the general revenue proceedings here under review.
 
 
 41
 Finally, NARI I argues that the Commission arbitrarily and capriciously usurped the decision-making functions of an administrative law judge who was formally assigned to make findings in Ex Parte No. 295 (Sub No. 1). However, the Commission waited five months for such findings and with none forthcoming, reviewed the evidence presented and made its own findings to expedite the process. We do not find this action arbitrary and capricious.
 
 
 42
 NARI II involves Ex Parte Nos. 313 and 305 RE. The former is discussed in Part I supra ; in the latter the Commission by order lifted a holddown on recyclables in the Ex Parte No. 305 proceeding also discussed in Part I. In neither of these proceedings did the Commission prepare an EIS or TAS, nor has it seriously sought to explain its conclusions that these actions will have no significant effect upon the quality of the human environment. We conclude that, despite the time limitations on these proceedings, the Commission has neglected its statutorily-imposed duty to comply with section 102 of NEPA "to the fullest extent possible."
 
 
 43
 Although several other issues are raised on the merits in NARI II, we do not reach them at this time. Both Ex Parte Nos. 305 RE and 313 are remanded to the Commission for a determination of the impact these rate increases will have on the quality of the human environment; otherwise, the orders of the ICC are affirmed.
 
 
 44
 It is so ordered.
 
 
 
 *
 By order of the Court, sua sponte, Oct. 20, 1977, the opinion is amended to include the captions of the following cases: Asphalt Roofing Manufacturers Ass'n, et al. v. United States, et al., No. 75-2028; Institute of Scrap Iron & Steel, et al. v. United States, et al., No. 75-1982 and Asphalt Roofing Manufacturers Ass'n, et al. v. United States, et al., No. 75-2029; and National Association of Recycling Industries, Inc. v. United States, et al., Nos. 75-1255 and 75-2022
 
 
 *
 Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a). Justice Clark heard oral argument in this case but died thereafter and did not participate in the final decision
 
 
 [1]
 (1) Asphalt Roofing Manufacturers Ass'n, et al. v. United States, et al., No. 75-1641 and consolidated cases Nos. 75-1716, 75-1760, 75-1768, 75-1799, 75-1833, 75-1893, 75-1894, 75-1895 and 75-1937; (2) Asphalt Roofing Manufacturers Ass'n, et al. v. United States, et al., No. 75-2028; (3) Institute of Scrap Iron & Steel, et al. v. United States, et al., No. 75-1982 and Asphalt Roofing Manufacturers Ass'n, et al. v. United States, et al., No. 75-2029; and (4) National Association of Recycling Industries, Inc. v. United States, et al., Nos. 75-1255 and 75-2022
 
 
 [2]
 Ex Parte Nos. 305 and 313 are also subject in part to environmental challenges, as will be discussed in Part II infra
 
 
 [3]
 A "holddown" is the imposition of a maximum increase on a rate below the full level of the general increase
 
 
 [4]
 A "flag-out" is a carrier-made exemption from a general rate increase
 
 
 [5]
 Despite some earlier authority suggesting the contrary, it is now established that ICC rules required by section 1(14)(a) to be made after a "full hearing" are subject not to the Administrative Procedure Act (APA) provisions governing adjudications, 5 U.S.C. §§ 554 and 557 (1970), but rather to that governing informal rulemaking proceedings, 5 U.S.C. § 553. United States v. Florida East Coast R.R., 410 U.S. 224, 234-46, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel Co., 406 U.S. 742, 757-58, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). The general revenue proceedings in the present case were conducted under section 15(1), which permits the Commission to issue orders after "full hearing," but like section 1(14)(a) does not require that the decision be made "on the record," 5 U.S.C. § 554. The three-judge court in SCRAP, 371 F.Supp. 1291, 1306-07, rev'd on other grounds, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191, thus held that proceedings under section 15(1) are reviewable under the "arbitrary, capricious, (or) abuse of discretion" standard of 5 U.S.C. § 706(2)(A), rather than the "substantial evidence" standard of 5 U.S.C. § 706(2)(E). This analysis of the standard of review is sound, and we conclude that if any review of Commission orders in general revenue proceedings is available, it must be under the standards of section 706(2)(A)
 
 
 [6]
 For example, over 400 railroads were respondents in the ICC investigation. Of these 400-plus, 14 railroads receive 66% Of the national freight revenue; 8 of the 14 railroads receive 35% Of the national freight revenue; these 8 will receive 50% Of the national increase; these 8 pay out 55% Of the national dividends; the top 14 pay out 89% Of the national railroads' dividends; and the five railway systems with the highest earnings margin ratios are receiving 67% Of national net railway operating income and will get one-third of the proceeds from the 7% Increase
 
 
 [7]
 Ex Parte No. 295, Increased Freight Rates and Charges, 1973
 
 
 [8]
 Ex Parte No. 281, Increased Freight Rates and Charges, 1972