The COUNCIL OF FOREST INDUSTRIES OF BRITISH COLUMBIA, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Atchison, Topeka & Santa Fe Railway Co., et al., and Eastern, Southern & Western Railroads, Intervenors.

No. 76–1926.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 2, 1977.

Decided Feb. 3, 1978.

Thomas F. McFarland, Jr., Chicago, Ill., with whom Harold E. Spencer, Chicago, Ill., was on the brief, for petitioner.

Kenneth G. Caplan, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, and Charles H. White, Jr., Assoc. Gen. Counsel, I. C. C., and Peter I. De la Cruz, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents. Lloyd John Osborn and Barry Grossman, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents.

Lee A. Monroe, Washington, D. C., with whom Richard J. Flynn, Peter J. Vaghi, and R. Eden Martin, Washington, D. C., were on the brief, for intervenors. Susan G. Smith, Washington, D. C., also entered an appearance for intervenors.

Before WRIGHT, LEVENTHAL and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

In this action the Council of Forest Industries of British Columbia (COFI), an organization of Western Canadian lumber shippers, petitions for review of a portion of an order of the Interstate Commerce Commission (ICC) issued at the conclusion of a general revenue proceeding.[1] The ICC's order authorized up to a seven percent general increase in railroad freight rates and charges, with exceptions covering certain territories, carriers, and commodities.[2] The exceptions included rates on traffic to or from points in the Western Territory in the United States.[3] Petitioner challenges that portion of the order that authorizes increased rates on lumber and related articles from origins in Western Canada to points in the United States without simultaneously authorizing a corresponding increase in rail rates on the same articles from origins in Washington and Idaho (the "Northwest United States"). Alleging that the ICC's order constitutes a final determination that this discrimination is justified, petitioner urges this court to review the ICC's action at this time and to find that part of it lacks a rational basis and that part was done without granting petitioner the procedural opportunities required by law.

Respondents ICC and the United States, joined by nearly all the railroads in the United States as intervenors, deny petitioner's substantive contentions and argue further that the ICC has *not* finally determined that the rate discrimination is justified, and that judicial review is thus inappropriate at this time. They assert that

---

1. For a description of a general revenue proceeding, *see* pp. ———–——— *infra,* p. 1060 of 570 F.2d *infra.*

2. ICC, Ex Parte No. 318, Increased Freight Rates and Charges—1976, Aug. 2, 1976 (hereinafter cited as Ex Parte 318), JA 1, at JA 75 ("Ultimate Conclusions and Findings" Nos. 3 and 4), JA 77–78 (Appendix A: General Exceptions from the Increase), JA 79–86 (Appendix B: Special Exceptions from the Increase), JA 121–192 (Appendix F: Commodity Groups), JA 193 (Appendix G: Nonapplication and Holddowns of Increases in Rates and Charges).

3. *See* Ex Parte 318, *supra* note 2, at JA 77 (Appendix A).

rather than challenging the general revenue order—issued after a Section 15(7) (now 15(8)) [4] proceeding in which the carriers bore the burden of proof—petitioner must wait until the carriers who serve the members of COFI actually increase their rates. According to respondents and intervenors, COFI can then challenge the increases in proceedings under Sections 13(1) and 15(1) of the Interstate Commerce Act (the Act), 49 U.S.C. §§ 13(1), 15(1) (1970)— proceedings in which the shippers, rather than the carriers, bear the burden of proof—and judicial review will be available following these administrative proceedings. Although we find the procedures followed

by the ICC in general revenue proceedings and the law governing judicial review of such proceedings in need of clarification, we agree with respondents that under the particular circumstances of this case review is not available to petitioner at this time.

## I. THE ADMINISTRATIVE PROCEDURES INVOLVED

The Act allows the railroads to initiate rate increases by filing tariffs with the ICC. Once a tariff has been submitted, the ICC may investigate whether the increase is lawful and in some cases may suspend the increase for up to seven months pending the outcome of an investigation.[5]  If the ICC

**4.** The Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No. 94–210, 90 Stat. 31 (hereinafter cited as 1976 Amendments), made § 15(7) inapplicable to railroads and enacted a new § 15(8), patterned on § 15(7) but with several differences. *Id.* § 202(e), 90 Stat. 36–39; *see* notes 5–7 *infra.* Although these amendments became law on February 5, 1976, a relatively early point in the litigation involved here, the parties have apparently treated § 15(7) as controlling, and in any case no party has suggested that the 1976 changes would affect the outcome of this litigation in any way. Since the parties have not raised the issue, we do not decide whether any provisions of the 1976 Amendments would affect our conclusions.

**5.** Until the 1976 Amendments, *supra* note 4, § 15(7) outlined the ICC's possible responses to proposed increases:

Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would

otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible.

49 U.S.C. § 15(7) (1970). Since the Amendments, § 15(8) serves this function. 49 U.S. C.A. § 15(8) (1977 Pocket Part). The new § 15(8) requires that any investigation by the ICC be completed within seven months (or, with congressional approval, 10 months) and narrows the ICC's discretion to suspend pro-

does not suspend a rate increase, the increase becomes effective within 30 days after it is filed. 49 U.S.C. § 6(3) (1970). If the ICC does suspend the increase, it becomes effective when the suspension ends unless the rate has been found unlawful. In an investigation of a proposed rate increase conducted pursuant to Section 15(7) (now 15(8)) of the Act, the railroads have the burden of proving that an increase is just and reasonable.[6] If such an investigation reveals that any portion of an increase is "not justified" after the increase has been in effect, the railroads may be ordered to refund any excess amounts collected pursuant to the increase.[7]

Once the ICC has approved a rate or has failed to declare it unlawful, those who wish to challenge the rate may file a complaint with the ICC under Section 13(1),[8] but in any ICC investigation of such a complaint (under Section 15(1)),[9] the complainant bears the burden of proving that the rate is unlawful, *see Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 812–813, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (plurality opinion of Marshall, J.). Furthermore, if the ICC in a

posed rate increases and to determine whether a proposed rate is just and reasonable. *See* 49 U.S.C.A. §§ 1(5)(b), 15(8)(b)–(d) (1977 Pocket Part). Another division of this court has recently held that the language of § 15(7) commits the ICC's decision whether to investigate a proposed increase to the agency's unreviewable discretion. *Asphalt Roofing Manufacturers Ass'n v. ICC,* 186 U.S.App.D.C. 1, 8, 567 F.2d 994, 1001 (1977).

6. 49 U.S.C. § 15(7) (1970); 49 U.S.C.A. § 15(8)(f) (1977 Pocket Part).

7. 49 U.S.C. § 15(7) (1970). The 1976 Amendments broaden the refund provision and make it less discretionary. *See* 49 U.S.C.A. § 15(8)(e) (1977 Pocket Part).

8. Any person, firm, corporation, company, or association, or any mercantile, agricultural, or manufacturing society or other organization, or any body politic or municipal organization, or any common carrier complaining of anything done or omitted to be done by any common carrier subject to the provisions of this chapter in contravention of the provisions thereof, may apply to said Commission by petition, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the Commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been done, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper. 49 U.S.C. § 13(1) (1970).

9. Whenever, after full hearing, upon a complaint made as provided in section 13 of this title, or after full hearing under an order for investigation and hearing made by the Commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this chapter for the transportation of persons or property, as defined in section 1 of this title, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this chapter, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.

49 U.S.C. § 15(1) (1970).

Section 15(1) proceeding finds a rate discriminatory, the successful claimant is not automatically entitled to a refund of "overpayments" but may recover only the actual damages it has suffered in the marketplace as a result of the discriminatory rate.[10]

Procedures following this general outline govern both rate filings by individual carriers and general revenue proceedings like that involved in this case.[11] General revenue proceedings are initiated when all or substantially all the nation's railroads submit a tariff proposing an across-the-board increase in rates. The ICC may find such general increases just and reasonable after taking evidence relating to the general need for increased revenues, see *New England Divisions Case,* 261 U.S. 184, 196–199, 201–203, 43 S.Ct. 270, 67 L.Ed. 605 (1923), or may approve the increase by declining to find it unlawful after an investigation pursuant to Section 15(7) of the Act (the procedure followed in this case). *See United States v. Louisiana,* 290 U.S. 70, 73–79, 54 S.Ct. 28, 78 L.Ed. 181 (1933). *See generally Aberdeen & Rockfish R. Co. v. SCRAP (SCRAP II),* 422 U.S. 289, 311–316, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); 49 C.F.R. § 1102 (1976). In theory the ICC does not consider or determine the lawfulness of particular rates in general revenue proceedings. The crucial issue in such proceedings is the need of the carriers for increased revenues, not whether any particular application of the increase is just or reasonable. Nevertheless, the effect of ICC approval of a general increase is to shift the burden of

proof from those favoring an increase to those opposing it. Once the general increase has been approved, specific increases within the approved limit are subject to attack only in proceedings under Sections 13(1) and 15(1). This burden-shifting procedure is presumably justified by the need for quick action and the assumption that once a general need has been demonstrated most individual increases will be found just and reasonable.

## II. JUDICIAL REVIEW OF ICC ORDERS IN GENERAL REVENUE PROCEEDINGS

Prior cases have considered three types of challenges to ICC actions in general revenue proceedings: (1) challenges to the general rate increase as applied to particular commodities based on the alleged unreasonable effect of the increase on the particular commodities; (2) challenges to the reasonableness of the general increase as a whole (*e.g.,* a claim that the carriers do not need increased revenue); and (3) challenges to the adequacy of the Environmental Impact Statement (EIS) prepared in conjunction with the general revenue proceeding. It seems settled that challenges of the first, more narrow, type must be brought under Sections 13(1) and 15(1) of the Act, rather than in suits seeking review of the ICC's determination that the general increase is just and reasonable. *Electronic Industries Ass'n v. United States,* 310 F.Supp. 1286

---

**10.** *See, e.g., ICC v. United States ex rel. Campbell,* 289 U.S. 385, 389–390, 53 S.Ct. 607, 77 L.Ed.2d 1273 (1933); *Pennsylvania R. Co. v. International Coal Mining Co.,* 230 U.S. 184, 197–203, 33 S.Ct. 893, 57 L.Ed. 1446 (1913) (automatic refund not available in cases involving discriminatory rates). *But cf. Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,* 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (automatic refund available in cases involving unreasonable rates). *See generally* 2 I. Sharfman, The Interstate Commerce Commission 387–389 n.64 (1931).

**11.** There are, of course, differences between general proceedings and individual rate filings. If the ICC conducts an investigation of an individual rate pursuant to § 15(7) (now 15(8)) and finds that the rate is lawful, this conclusion

bars any subsequent action for reparation under §§ 13(1) and 15(1). *See Arizona Grocery Co. v. Atchison, Topeka & Santa Fe R. Co.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). On the other hand, individual rates are not generally "approved" in general proceedings, and subsequent challenges to their lawfulness therefore remain possible. The 1976 Amendments, *supra* note 4, introduce at least one additional difference between the ICC's powers in dealing with general increases and its powers in dealing with non-general increases. *See* 49 U.S.C.A. § 15(8)(c) (1977 Pocket Part) (certain limitations of Commission's power to suspend rate changes "apply only to rate changes which are not of general applicability to all or substantially all classes of traffic").

(D.D.C. 1970) (three-judge court), *aff'd mem.,* 401 U.S. 967, 91 S.Ct. 1188, 28 L.Ed.2d 318 (1971) (suit by a national organization of manufacturers of electronic products seeking to annul only that portion of an ICC general increase order permitting an increase in rates for transporting two electronic products); *Florida Citrus Comm'n v. United States,* 144 F.Supp. 517 (N.D.Fla. 1956) (three-judge court), *aff'd mem.,* 352 U.S. 1021, 77 S.Ct. 589, 1 L.Ed.2d 595 (1957). Since the ICC normally limits itself in general revenue proceedings to broader issues and expressly reserves judgment on whether any particular rate instituted under the general ceiling would be just and reasonable, the courts have concluded that the ICC's general action leaves questions about particular rates open to be determined in later proceedings focusing on individual applications of the general increase. Judicial review is held to be available only after the appropriate administrative remedies have been exhausted. *See Algoma Coal & Coke Co. v. United States,* 11 F.Supp. 487, 495–496 (E.D.Va. 1935) (three-judge court).

The law with respect to judicial review in cases involving the second type of challenge—challenges to the bases for the ICC's approval of the general increase as a whole—is still uncertain. Although two courts have held that even the ICC's conclusions as to the reasonableness of a general increase are unreviewable, the Supreme Court affirmed these cases by an equally divided vote, leaving its decision without precedential effect.[12] *See Alabama Power Co. v. United States,* 316 F.Supp. 337 (D. D.C. 1969) (three-judge court), and *Atlantic City Electric Co. v. United States,* 306 F.Supp. 338 (S.D.N.Y. 1969) (three-judge court), both *aff'd mem.* by an equally divid-

ed Court, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970). Allowing review when petitioners raise broad challenges to the Commission's approval of a general increase is attractive because it would avoid needless relitigation, because challenging such general conclusions in individual proceedings would be difficult or impossible, and because this sort of threshold question should be determined at the outset.[13] Furthermore, in contrast to its avoidance of questions about particular rates, the ICC in general proceedings focuses its attention on broad issues. In apparent recognition of these policy considerations, the United States and the ICC now take the position that the ICC's conclusions on general issues such as the need of the nation's railroads for increased revenues should be immediately reviewable.[14] *See SCRAP II, supra,* 422 U.S. at 317 n.18, 95 S.Ct. 2336; *Asphalt Roofing Manufacturers Ass'n v. ICC,* 186 U.S.App.D.C. 1, 7–8, 567 F.2d 994, 1000– 1001 (1977); brief for respondents at 15.

The Supreme Court specifically reserved the question raised in *Alabama Power* and *Atlantic City Electric* in its only decision upholding review of ICC action in a general revenue proceeding, *SCRAP II, supra,* 422 U.S. at 317–318 n.18, 95 S.Ct. 2336. *SCRAP II* involved the third type of challenge to ICC general revenue orders—an attack on the adequacy of the ICC's Environmental Impact Statement issued to accompany the agency's general order. The Court held that the EIS was reviewable because the general proceeding qualified as a major federal action that required its own EIS and that the determinations in the EIS accompanying the ICC's order were therefore final. Nevertheless, emphasizing the ICC's

---

12. *See Hertz v. Woodman,* 218 U.S. 205, 213– 214, 30 S.Ct. 621, 623, 54 L.Ed. 1001 (1910) ("affirmance by an equally divided court is as between the parties a conclusive determination and adjudication of the matter adjudged, but the principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in this or in inferior courts.").

13. *See Alabama Power Co. v. United States,* 316 F.Supp. 337, 339 (D.D.C. 1969) (three-judge court) (Wright, J., dissenting).

14. The railroads alone cling to the proposition that courts may not review general revenue orders even when petitioners challenge them on general grounds. *See, e.g.,* brief for intervenors at 11–15.

power to limit the scope of its general revenue proceedings,[15] the Court held that the EIS with respect to a general revenue proceeding may similarly be limited in comprehensiveness. The Court therefore refused to affirm a three-judge District Court's conclusion that the EIS under review was inadequate.

The current law may thus be summarized as follows: Review of ICC orders approving a general increase is *not* available when the petitioners are actually seeking review of the reasonableness of *particular rates* because these issues are not appropriate for consideration in general proceedings, are not addressed by the ICC, and remain open for determination in individual proceedings under Sections 13(1) and 15(1). Review of ICC orders *might* be available when petitioners challenge the bases for the ICC's general determinations (such as a finding that the carriers need an increase in revenue) because general proceedings are the appropriate forum for considering such issues, the ICC addresses them, and its conclusions are effectively final. Review of the adequacy of the ICC's EIS accompanying a general revenue order *is* available because the EIS represents a final determination of issues related to the general revenue proceeding, but the standard for review in such cases is limited by the narrow scope of issues covered in a general proceeding.

## III. REVIEW IN THE CIRCUMSTANCES OF THIS CASE

The case before us does not fit nicely into any of the categories developed in prior

case law. It is not based on an EIS, and the issue it raises falls somewhere between the general issues that the ICC customarily addresses in general revenue proceedings and the particular issues that it supposedly ignores. By the terms of the ICC order one geographical area was excluded from the general increase. Petitioner claims that this exclusion caused transportation rates to be higher for its members than for their competitors in the Northwest United States, and that the ICC's action was discriminatory and prejudicial in violation of Section 3(1) of the Act.

While accepting the position that general challenges to ICC general increase orders are immediately reviewable, the ICC and the United States claim that this petition is not reviewable at this time because it is essentially a challenge to a particular rate. Respondents thus assert that the case is controlled by *Electronic Industries, supra.* Petitioner contends that the *issue* involved is not any particular rate but the broad territorial discrimination resulting from the exclusion of shipments from a large geographical area.[16] COFI also points out that the ICC "considered" the claim raised here in the proceedings below and published its "conclusion" that the discrimination was justified in an appendix to its order.[17] Petitioner argues that this finding constitutes a final determination that will control any subsequent proceedings and should therefore be reviewed now. The Government responds that in spite of the language in the appendix the ICC did not give the mat-

---

15. *Aberdeen & Rockfish R. Co. v. SCRAP (SCRAP II)*, 422 U.S. 289, 313–314, 322–328, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); *see United States v. Louisiana*, 290 U.S. 70, 76–77, 54 S.Ct. 28, 78 L.Ed. 181 (1933).

16. *See, e.g.,* reply brief for petitioner at 3. In at least one earlier case the ICC treated alleged discrimination as an issue worthy of consideration in a general revenue proceeding, and a court reviewed the ICC's conclusion and found it "supported by the evidence." *See Florida Citrus Comm'n v. United States,* 144 F.Supp. 517, 525 (N.D.Fla. 1956) (three-judge court) (alleged discrimination between charges for fresh fruits, vegetables, melons, berries, and processed foods on the one hand and fresh meats

and packinghouse products, fish, dairy products, bananas, coconuts, and beer on the other).

17. *See* Ex Parte 318, *supra* note 2, Appendix F, at 187–188, JA 187–188.

It is our conclusion that the difference in motor carrier competition between the Pacific Northwest and Western Canada is sufficient justification for the dissimilar treatment here. This, coupled with the carrier's demonstrated need for additional revenue[,] warrants our approval of this application of Supplement 7. \* \* \*

*Id.* at 188, JA 188.

ter "full consideration," that the ICC order specifically left the issue open,[18] and that a proper determination will be made after full consideration in the appropriate context—a proceeding under Sections 13(1) and 15(1).

These conflicting contentions reflect the divergence between the ICC's actual practice in general revenue proceedings and the ideal paradigm of a proceeding limited solely to a consideration of general revenue needs. In many cases, such as the one involved here, the tariff approved by the ICC not only implements a so-called general increase in maximum rates, but also exempts certain particular territories, carriers, or commodities from the increase. These exemptions—termed exceptions, flagouts, and holddowns—may be fairly narrow or, as that involved here, more general in character. The presence of such exemptions in general revenue orders weakens the policy argument against immediate judicial review of the general increase as applied to particular rates—at least those rates affected by the exemptions. The ICC apparently has taken time to consider the situations of particular commodities, territories, and carriers, and has taken action that specifically affects them.[19] Nevertheless, the ICC in this case resists judicial review of a complaint growing out of an exception to its general order, urging that the issue involved was ancillary to the general proceeding, was given only cursory consideration, and has not been finally determined.

Including certain exceptions in general increase orders may in some cases be useful,[20] and if such exceptions are to be included, a preliminary review by the ICC of the justification for any exception, based on some sort of *prima facie* evidence standard like that apparently employed in the proceedings below, may be a salutary procedure. Nevertheless, in light of the differences in burden of proof and nature of recovery that may result when an exception is included as part of a general order,[21] we are disturbed by the ICC's failure to articulate the standards and procedures to be employed in such a preliminary inquiry or to clarify the influence of any preliminary conclusion on later proceedings.

---

**18.** *See, e.g.,* Ex Parte 318, *supra* note 2, at 76, JA 76 ("Ultimate Conclusions and Findings"):

> Our findings as to justness and reasonableness, which are based upon all the evidence before us, including typical evidence as to rates and charges in and between all territories, will apply to the general bases of rates and charges, and will not preclude interested parties from bringing any maladjustments to our attention for correction. The increased freight rates and charges authorized herein are not considered as prescribed within the meaning of the decision in *Arizona Grocery Co. v. Atchison, T.&S.F. Ry. Co.,* 284 U.S. 370, [52 S.Ct. 183, 76 L.Ed. 348], and will, in all respects, be subject to complaint and investigation as provided by the act.

**19.** The ICC regulations on general increase proceedings require the railroads to publish and account for "in general terms any holddowns, flagouts, and exceptions," 49 C.F.R. §§ 1102.-1(a)(2) & (3), (b)(1) & (2) (1976), and to make available the data underlying their explanations. *Id.* § 1102.9. The ICC's order in Ex Parte 318 indicates that the Commission gave at least some consideration to those rates affected by the exceptions that were challenged during the proceeding. *See, e.g.,* Ex Parte 318, *supra* note 2, at 79–86, 121–193, JA 79–86, JA 121–193. The ICC actions in allowing an ex-

ception to remain in the tariff, requiring that an exception be removed, insisting on an additional exception, or refusing to insist on an exception affect the burden of proof in proceedings concerning the rates in question. *See* text and notes at notes 5–10 *supra.*

**20.** For example, a rate increase might be inappropriate for a particular commodity, territory, or carrier because of the economic condition of the carrier or industry involved, environmental considerations, *see SCRAP II, supra* note 15, or the existence of competition from other modes of transportation (the apparent ground for the exception involved in this case). Exempting rates from the increase where an increase would clearly be unreasonable or unjust or discriminatory avoids the necessity for additional proceedings where the end result is not in doubt. We note in passing, however, that it is not completely clear to this court why exceptions are necessary when competition from other carriers is the problem and an order that only authorizes *maximum* rates is involved. In such circumstances carriers presumably can and will set their actual rates below the maximum.

**21.** *See* text and notes at notes 5–10 *supra.*

Despite these concerns, we are not persuaded that the particular circumstances of this case warrant a result different from that in *Electronic Industries*. Unlike *Alabama Power*, this case is not a class action challenging the entire general increase order. Petitioner here, like the petitioner in *Electronic Industries*, challenges only those portions of the general increase order that may affect the rates for its particular commodities—lumber and related articles. Although petitioner claims that the *issue* it raises—broad territorial discrimination—is general in character, all its major arguments are based on data from the lumber industry alone. A general proceeding is not necessary to resolve these arguments or to grant the relief they require. More importantly, although COFI claims that the ICC considered the discrimination issue and made a final determination, the Commission did not purport to give full consideration to the discrimination issue, and its "conclusions" appeared only in a brief passage in an appendix to its order. We emphasize in particular that the ICC has represented in its brief and at oral argument that this "conclusion" is not "final" and will in no way influence the outcome of a subsequent proceeding under Sections 13(1) and 15(1).[22] Finally, we note that we must decide this case in the shadow of the possibility that judicial review might not be available even if COFI's challenge were clearly general

and even if the issue it raises had been effectively settled in the general proceeding. If the Supreme Court were to decide that the reasoning in *Alabama Power* and *Atlantic City Electric* should be followed, then review would be unavailable *a fortiori* in cases such as this one. Although the ICC and the United States now apparently agree that these cases were wrongly decided, the Supreme Court has thus far failed to resolve this troublesome uncertainty or to provide guidelines for resolving intermediate cases like the one we decide today. Unfortunately, the circumstances of this case do not squarely present the issue raised in *Alabama Power* and *Atlantic City Electric*, and this petition is therefore an inappropriate vehicle for deciding that still unsettled question.[23]

We therefore decline to review the ICC's action as it affects petitioner at this time, and we conclude that petitioner is limited to its remedies under Sections 13(1) and 15(1). COFI's petition is accordingly

*Dismissed.*

**22.** *See* brief for respondents at 17–19.

**23.** The question was recently squarely presented to another division of this court in *Asphalt Roofing Manufacturers Ass'n v. ICC, supra* note 5, 186 U.S.App.D.C. at 9–10, 567 F.2d at 1002–1003. Employing a rarely used procedure, the court avoided deciding whether the Commission's order in a general revenue proceeding was reviewable by assuming arguendo that the order was reviewable and finding on review that the Commission's conclusion "rested firmly on a rational basis." 186 U.S.App. D.C. at 9, 567 F.2d at 1002. *Cf. Rabinowitz v. Kennedy,* 376 U.S. 605, 607, 84 S.Ct. 919, 11 L.Ed.2d 940 (1964).