585 F.2d 522
 12 ERC 1517, 190 U.S.App.D.C. 118, 8
Envtl. L. Rep. 20,653
 NATIONAL ASSOCIATION OF RECYCLING INDUSTRIES, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Atchison, Topeka & Santa Fe Railway Company, et al.,
American Paper Institute, Inc., Aluminum Association, Inc.,
Fort Howard Paper Company, Eastern Railroads, and Bergstrom
Paper Company, et al., Intervenors.
NATIONAL ASSOCIATION OF RECYCLING INDUSTRIES, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Atchison, Topeka & Santa Fe Railway Company, et al., and
Eastern Railroads, Intervenors.
INSTITUTE OF SCRAP IRON AND STEEL, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Northwestern Steel & Wire Company, Eastern Railroads,
Atchison, Topeka & Santa Fe Railway Company, et
al., and Armco Steel Corporation, Intervenors.
 Nos. 77-1187, 77-1193 and 77-1292.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 16, 1978.
Decided Aug. 2, 1978.
As Amended Aug. 7 and 25, and Sept. 6, 1978.
As Amended on Rehearing Oct. 16, 1978.
 
 SYLLABUS
 The Interstate Commerce Commission instituted an investigation into the lawfulness of the rate structures on recyclable and virgin resource materials pursuant to Section 204 of the Railroad Revitalization and Regulatory Reform Act of 1976. After an investigation, the Commission, with three Commissioners dissenting, concluded that the majority of the rates were lawful and declined to order their removal. Petitioners filed petitions to review the Commission's order, claiming that the Commission did not comply with the mandate of Section 204 by, among other things, relieving the railroads of their statutory burden of proof and declining to order removal of unlawful rates on competing recyclable materials. The United States, as statutory respondent, joined in petitioners' challenge to the Commission's order. In a consolidated petition, petitioner also challenged a Commission order terminating two general revenue proceedings conducted during the pendency of the Commission's investigation on the ground that the Commission did not comply with the requirements of the National Environmental Policy Act of 1969. Held : The order of the Commission in its investigation is vacated, and the case remanded for further proceedings consistent with this opinion; the consolidated petition to review is dismissed as untimely filed. 190 U.S.App.D.C. at ---- - ----, 585 F.2d at 524-541.
 1. In view of the provisions of Section 204, its legislative history, and the background of congressional concern surrounding its enactment, the Commission's mandate was to investigate rates for recyclable or recycled materials and competing virgin natural resource materials, and to require removal from rate structures of unreasonableness or unjust discrimination; and the Commission was not permitted to assume or defer to asserted revenue needs or to give them greater weight than environmental and energy goals, but was to uphold disparate rate structures only where actually warranted after consideration of all of the transportation characteristics, including the competitive relationships and costs of the materials involved. 190 U.S.App.D.C. at ---- - ----, 585 F.2d at 530-534.
 2. On this record, the Commission's order does not represent a reasoned compliance with the mandate of Section 204. 190 U.S.App.D.C. at ---- - ----, 585 F.2d at 534-541.
 (a) The Commission did not address or require proof on the focal question whether the substantial rate disparities between recyclable and virgin products are justified by differences in transportation characteristics. 190 U.S.App.D.C. at ---- - ----, 585 F.2d at 535-541.
 (b) Several of the Commission's underlying findings and conclusions with respect to the reasonableness and unjust discrimination issues were inconsistent with its mandate and inadequately supported. 190 U.S.App.D.C. at ---- - ----, 585 F.2d at 535-541.
 3. The consolidated petition to review, filed in advance of the jurisdictional time limit, must be dismissed as premature. 190 U.S.App.D.C. at ----, --- F.2d at ----.
 Petitions for Review of Orders of the Interstate Commerce Commission.
 Edward L. Merrigan, Washington, D. C., for petitioner in Nos. 77-1187 and 77-1193 and on the reply brief for intervenor Bergstrom Paper Company Et al. in No. 77-1187.
 David Reichert, Cincinnati, Ohio, with whom Howard Gould and Stephen D. Strauss, Cincinnati, Ohio, were on the brief, for petitioner in No. 77-1292.
 Kenneth G. Caplan, Atty., I. C. C., Washington, D. C., with whom Robert S. Burk, Deputy Gen. Counsel, and Charles H. White, Jr. and Frederick W. Read, III, Associate Gen. Counsel, I. C. C., Washington, D. C., were on the brief, for respondent I. C. C. Mark L. Evans, Gen. Counsel, and Peter A. Fitzpatrick, Atty., I. C. C., Washington, D. C., also entered appearances for respondent I. C. C.
 James F. Ponsoldt, Atty., Dept. of Justice, Washington, D. C., with whom Barry Grossman, Atty., Dept. of Justice, Washington, D. C., was on the brief, for respondent United States of America. Lloyd John Osborn and Carl D. Lawson, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent United States of America.
 Michael Boudin, Washington, D. C., with whom Charles N. Marshall and Stuart C. Stock, Washington, D. C., were on the brief, for intervenor Southern and Western Railroads.
 John F. Donelan, Washington, D. C., with whom John K. Maser, III and Renee D. Rysdahl, Washington, D. C., were on the brief, for intervenors American Paper Institute, Armco Steel Corp., Inland Steel Corp., Republic Steel Corp., and Youngstown Sheet & Tube Co.
 John A. Daily, Philadelphia, Pa., with whom Richard W. Kienle was on the brief, for intervenor Eastern Railroads.
 Dickson R. Loos, Washington, D. C., was on the brief for intervenor Aluminum Association Inc.
 William L. Strauss, was on the brief for intervenor Fort Howard Paper Co.
 Warren Price, Jr., Washington, D. C., was on the brief for intervenor Northwestern Steel & Wire Co.
 Before WRIGHT, Chief Judge, and SWYGERT* and LEVENTHAL, Circuit Judges.
 Opinion for the court filed by J. SKELLY WRIGHT, Chief Judge.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 In these consolidated cases[1] we are called upon to review a final report and order of the Interstate Commerce Commission declining to remove alleged unlawful rates from the freight rate structures for recyclable and virgin resource materials transported by the nation's railroads. The order under review,[2] dissented from by three commissioners[3] and challenged here by both representatives of recycling industries[4] and the United States,[5] reflects the agency's efforts to comply with Section 204 of the Railroad Revitalization and Regulatory Reform Act of 1976.[6] This provision directed the Commission to conduct an expedited investigation into the lawfulness of the rate structures and to order removal of all rates not shown by the railroads to be just, reasonable, and nondiscriminatory.[7] We find that the challenged order does not represent a reasoned compliance with the mandate expressed by Congress in Section 204. We therefore vacate the order and remand for further proceedings.
 
 
 2
 * The significance and purpose of the investigation required by Section 204 cannot be understood apart from the Commission's past experience with ratemaking on recyclable materials. That experience occurred largely in the context of general revenue proceedings, in which the Commission's main task involved determination of the appropriate revenue levels and needs of the railroads, rather than the lawfulness of the rates on these materials. It is to the controversial history[8] of those proceedings that we turn first in placing the investigation under review, and the Commission's approach and findings therein, in proper perspective.
 
 
 3
 Under the Interstate Commerce Act[9] the initiative for ratemaking is vested in the railroads, subject to approval by the Commission in an appropriate proceeding. One method by which the railroads may initiate a rate increase is by filing a group tariff in which all or substantially all of the nation's railroads propose an across-the-board percentage increase in rates. In these so-called general revenue proceedings the Commission may either find the proposed increase just and reasonable after taking evidence related to the general need for increased revenues,[10] or "approve" the increase by declining to declare it unlawful following an investigation.[11] The characteristic feature of these proceedings is that the Commission focuses only on the need of the carriers for increased revenues, not on whether any particular application of the increase is just, reasonable, or nondiscriminatory. Nevertheless, the effect of Commission approval of a general increase is to shift the burden of proof from the carriers favoring the increase to complainants later challenging it.[12] Once the general increase has been approved, particular applications of the increase may then be challenged in subsequent proceedings under the Act.[13]
 
 
 4
 Pursuant to this scheme the Commission approved, over the past decade, a series of annual upward adjustments in rates applicable to recyclable materials.[14] Appearing in proceedings to oppose the proposed increases, shippers and representatives of recycling industries contended that the proposed rates and underlying rate structures on recyclable products were unreasonably high and discriminatory when compared with the lower rates and rate structures traditionally prevailing on virgin resource materials. They also maintained that application of the proposed increases to recyclables would adversely affect the environment by discouraging industrial use of recycled products, thereby contributing to depletion of the nation's virgin resources. In the limited context afforded by general revenue proceedings, and subject to the aforementioned rules governing complainants' burden of proof, the Commission invariably concluded that complainants had neither met their burden of refuting the railroads' submission of needed revenues, nor otherwise demonstrated that demand for recyclables would be unlawfully reduced as a result of the proposed increase.[15] Numerous environmental impact statements and threshold assessment surveys were also prepared,[16] concluding that increases in freight rates would have either no effect or a negligible one on industrial use of recycled products.
 
 
 5
 Throughout this period the Commission steadfastly refused to conduct a broad investigation into the lawfulness of the underlying rate structures on recyclable products. Apparently of the view that such an investigation was unnecessary in light of the findings reached in its general revenue proceedings, the Commission repeatedly declined requests by representatives of the recycling industry to undertake such an investigation,[17] and, indeed, vigorously opposed legislation under consideration by Congress that would have required nothing less.[18] Prodded by increasing litigation,[19] however, the Commission, on December 12, 1973, finally instituted an investigation[20] into the lawfulness of the rate structures for movements of scrap iron and steel, one of the recyclable materials herein involved. The Commission's final report, issued on February 4, 1976, confirmed generally its previous findings with respect to scrap iron and steel.[21] Citing the relative demand inelasticity of scrap iron and steel to freight rates, and finding that the relationship between scrap iron and iron ore in the steelmaking process is complementary and not competitive,[22] the report concluded that the rate structures were reasonable and nondiscriminatory. The environmental impact statement prepared for this proceeding also concluded that these rate structures did not have a significant impact on the environment.[23]
 
 
 6
 On February 5, 1976 Congress enacted the Regulatory Reform Act, including within it Section 204. This section, in addition to directing the Commission to investigate the rail rate structures for "recyclable materials" and for "competing virgin natural resource materials," as defined therein,[24] expressly reversed, for the purpose of the investigation, the rules normally governing complainants' burden of proof. It directed the Commission to determine, after a "public hearing during which the burden of proof shall be on" the railroads, whether the "rate structure(s), as affected by rate increases applicable to the transportation of such competing materials, is just, reasonable, and nondiscriminatory."[25] Section 204 further instructed the Commission to order removal of all unreasonableness or unjust discrimination from such rate structures.[26] The remaining provisions of the statute required the Commission to comply fully with the requirements of NEPA,[27] and directed the Environmental Protection Agency[28] and the Department of Transportation[29] to participate and assist the Commission in carrying out the required investigation.
 
 
 7
 Responding to this mandate, the Commission instituted the proceeding under review on February 25, 1976. By order it designated recyclable and virgin resource materials for inclusion within its investigation and instructed the railroads, in accordance with the burden of proof imposed upon them by Section 204, to submit evidence with respect to the costs and revenues derived from their movements of the listed materials.[30] It also, by order, incorporated into the record the findings and conclusions of its previous investigation in Ex Parte No. 270.[31] After public hearings and submission of verified statements from interested parties, the Commission issued its final report and order, accompanied by draft and final environmental impact statements, on February 1, 1977.
 
 
 8
 The evidence submitted by the railroads was repeatedly criticized by the federal agencies participating in the investigation,[32] and by the Commission itself in its final report.[33] It did indicate, however, that the rates for movements of the listed recyclable materials were significantly higher than those for their virgin resource material counterparts.[34] In many instances the railroads' evidence revealed that the rates on recyclables were in excess of the national average,[35] while corresponding rates on virgin materials were below compensatory levels.[36] Nevertheless, the Commission refused to conclude that the rate structures were unlawful based solely on the evidence of wide rate disparities. Instead, it determined that it would apply traditional ratemaking criteria to determine the lawfulness of the rate structures on a product-by-product basis.[37] Applying such criteria, it concluded that the rate structures on practically all of the recyclable materials were reasonable and that none of the rate structures were discriminatory. The articulated bases for these determinations varied slightly according to the product involved. Referring to the relative demand inelasticities of recyclable materials to freight rates, as shown by freight commodity statistics submitted by the railroads[38] and demand elasticity studies[39] employed in the environmental impact statement, the Commission found that the recent rate increases did not result in a decreased volume in the amount of recyclable traffic moved by the railroads. The Commission further found that several of the recyclable materials did not in fact compete with their virgin material counterparts for transportation purposes, and that shippers of recyclables were not competitively injured by current rate disparities. Based on these findings, supported by the conclusions of the accompanying environmental impact statement,[40] the Commission issued the final order here under review, declining, with few exceptions,[41] to order any reductions in the applicable rates.
 
 
 9
 Three Commissioners dissented from the majority's report, arguing that the Commission did not comply with its mandate under Section 204.[42] According to the dissenting Commissioners, the majority unlawfully relieved the railroads of their burden of proof under Section 204 by failing to require the railroads to justify the rate structures based on the transportation characteristics of the products involved. Advancing similar as well as other related challenges to the Commission's order,[43] petitioners thereupon filed these petitions for review, in which the United States has joined in urging that the order be set aside.
 
 II
 
 10
 Much of the controversy throughout this proceeding has centered on the appropriate interpretation to be given to the Commission's mandate under Section 204. We do not believe the interpretative issue is nearly as difficult as the array of conflicting and exceedingly elaborate positions presented by the parties would suggest.[44] Rather, we believe the language, and particularly the legislative history and background, of Section 204 make easily discernible the Commission's mandate in this investigation.
 
 
 11
 Section 204 was the result of several years of congressional study[45] and consideration of the problems of the recycling industry as a whole and the freight rates applied to recyclable products in particular. Informed of the limited amount of recycling occurring throughout the nation, and concerned with what it regarded as a regulatory barrier to attainment of national environmental and agency goals associated with promotion of industrial recycling,[46] Congress responded initially by including Section 603 within the Regional Rail Reorganization Act.[47] This section directed the Commission to "adopt appropriate rules" to "eliminate discrimination against the shipment of recyclable materials in rate structures and in other Commission practices where such discrimination exists."[48] As has been interpreted elsewhere, Section 603 was a clear "legislative recognition of discrimination in the existing railroad rate structures and a legislative direction to the commission to eliminate it."[49]
 
 
 12
 The Commission virtually ignored the statutory message contained in Section 603. Rather than instituting a broad investigation into the lawfulness of the rate structures, the Commission responded by promulgating redundant rules governing procedures for filing a complaint with the agency.[50] Moreover, the Commission thereafter approved another series of general rate increases applicable to recyclables,[51] thereby possibly exacerbating the discrimination Congress believed was firmly imbedded in the rate structures.
 
 
 13
 The Commission's persistent refusal to investigate the rate structures, combined with its continued approval of rate increases applicable to recyclables, led representatives of the recycling industries to support a number of bills subsequently introduced in Congress.[52] Like Section 603, these bills all revealed Congress' dissatisfaction with the approach displayed by the Commission in its general revenue proceedings, and were aimed at eliminating rate structures which in Congress' view impeded development of increased recycling. In addition to explicitly requiring the Commission to investigate the rate structures, they would have compelled the Commission to adopt a presumption of competition between recyclable and virgin materials for the purpose of its investigation,[53] and to establish recyclable rates at the lowest lawful levels compatible with maintenance of adequate transportation service.[54] Although some of these bills were vigorously opposed by the Commission and eventually died in committee, Section 204 was finally enacted by Congress as that section emerged from the bills comprising the Regulatory Reform Act.[55]
 
 
 14
 Section 204, we believe, did not differ materially by either its terms or its underlying purpose from the bills considered and rejected by Congress. Just as those bills did not purport to change or modify substantive standards relating to the lawfulness of rates,[56] neither did Section 204. Congress used familiar language, having a long-settled meaning in transportation law, in proscribing "unreasonableness" and "unjust discrimination" in rate structures. It is apparent from the use of such established terms that Congress deemed traditional transportation policy criteria adequate protection against rate structures which discouraged industrial use of recycled products.
 
 
 15
 At the same time, however, Section 204, like previous bills, was intended to ensure proper application by the Commission of established statutory standards. Thus, by reversing the rules governing complainants' burden of proof, Section 204 both precluded the Commission from adopting the approach taken in its general revenue proceedings, whereby it approved disparate rate structures based on the railroads' revenue needs, and required the railroads to justify fully the rate structures involved under established ratemaking standards.
 
 
 16
 In the order under review[57] and before this court[58] the Commission has urged that in applying traditional standards in this investigation it was unnecessary to require the railroads to adduce proof on all factors related to transportation of commodities, and that instead it was incumbent on the recycling industry to demonstrate by way of rebuttal those factors militating against the lawfulness of the rate structures. We believe the Commission's position reveals a serious misapprehension of the significance of the statutory reversal of the burden of proof in Section 204. As previously noted,[59] the burden-shifting procedure employed by the Commission in its general revenue proceedings is premised on the notion that once the railroads have demonstrated a need for additional revenues, most individual increases within the approved limit will be found just and lawful. The Commission approved the rate increases on recyclables subject to this procedure and its concomitant assumption in its general revenue proceedings. By reversing the burden of proof in this proceeding, however, Congress accomplished more than a mere change in the procedural format for presentation of evidence, suggested by the Commission. Specifically, it erected an evidentiary presumption against the lawfulness of the rate structures, thereby preventing the Commission from assuming, or otherwise deferring to, asserted revenue needs of the railroads in determining the lawfulness of the rates. Unlike general revenue proceedings, this investigation was to proceed from the premise that disparate rate structures were not justified by the revenue needs of the railroads, and were therefore only to be upheld where actually warranted after consideration of all of the transportation characteristics, including the competitive relationships and costs, of the materials involved.
 
 
 17
 This theme that Congress firmly opposed disparate rates maintained by the Commission to protect the railroads' general revenue needs without complete consideration of the transportation characteristics of these products is clearly revealed by both of the relevant portions of the legislative history of Section 204, the Senate Commerce Committee Report[60] and the remarks made on the floor of the Senate.[61] Thus, in view of the provisions of Section 204, its legislative history, and the background of congressional concern surrounding its enactment, we have no doubt that the Commission's mandate in this investigation was to identify and remove disparities in the rate structures based on an in-depth examination of the transportation characteristics involved. The Commission, in the view of the proponents of Section 204, had erected barriers to industrial recycling by approving rate increases under the limited criteria applied in its general revenue proceedings. Under Section 204 it was up to the Commission to eliminate these barriers, after a complete investigation of the rate structures in this proceeding.
 
 
 18
 Moreover, we reject the view[62] that Congress in some manner defeated the purpose of this investigation by its inclusion of Section 204 within the framework of the Regulatory Reform Act. As we have recently observed, this Act was not only a legislative enactment designed "to restore the financial stability of our railway system and promote its revitalization," but was also an expression of congressional concern "that the interests of the railroads be balanced with the needs of shippers and the public."[63] Section 204, dealing with an area of importance to the nation's environment, struck the balance Congress deemed appropriate after its consideration of the interests involved. In so doing Congress tilted the scales against existing rate structures fostered by the Commission in its general revenue proceedings. It was not for the Commission to disagree with this legislative judgment by giving greater weight to concerns for railroad profitability than to the environmental and energy goals underlying the investigation.
 
 III
 
 19
 We agree with the dissenting Commissioners that on this record the Commission's approval of the rate structures was not consistent with its mandate. The challenged order does not meaningfully address the focal question presented by its investigation, namely whether the substantial rate disparities between recyclable and virgin products are justified, in whole or in part, by the transportation characteristics of the products involved. The Commission, by finessing this and other questions,[64] effectively relieved the railroads of their burden of proof under Section 204.
 
 
 20
 Even reviewing the Commission's order on its own terms, we also find that several of its underlying findings and conclusions are inadequately supported and arbitrary. Applying a standard of competition which was both unduly narrow and inconsistent with its Section 204 mandate, the Commission again found that recyclable and virgin products do not compete for transportation purposes. These findings, based more on the Commission's perceptions of industry structures than on articulated determinations with respect to rate structures, neither comport with the Commission's mandate nor rationally flow from the record before us. Since the Commission was required in this proceeding to supply a reasoned decision with respect to two issues whether the rate structures were shown to be reasonable and whether they were shown to be not unjustly discriminatory we shall discuss the Commission's determinations on each of these aspects separately.A. Reasonableness Issues
 
 
 21
 The Commission determined that in ascertaining the reasonableness of the rate structures it would not consider the rates on recyclables to be unreasonable unless they had resulted in a diminished volume of traffic during past years, or unless it appeared that recyclable materials could not absorb current rates.[65] It applied no other standard of reasonableness[66] and offered no explanation for its decision to focus exclusively on these criteria. Moreover, despite evidence of unusually high rate structures, the Commission refused to articulate a standard of maximum reasonableness for recycled products, stressing instead the need to consider in all instances the "public interest in a viable and efficient railroad industry"[67] and "the maintenance of adequate revenue levels for the railroads"[68] in determining the reasonableness of the rate structures.
 
 
 22
 As we have stated, the Commission was clearly authorized by Section 204 to apply traditional ratemaking criteria in this investigation. And we recognize that among such criteria the Commission normally is entitled to consider as one factor the effect of rates in terms of the volume of traffic moved. In view of the Commission's mandate in this proceeding and the evidence before it, however, we do not believe its decision to focus exclusively on this factor constituted an application of "satisfactory"[69] or proper and legal standards.[70]
 
 
 23
 The most salient theme that stands out in the legislative history of Section 204 is that Congress did not regard the existing rates on recyclables to be lawful Solely because these materials could withstand rate increases and continue to move by rail. Congress, as we have seen, was concerned with rate barriers to Increased levels of recycling, as well as with the maintenance of existing ones. It believed, based on the data and information before it, that removal of unreasonableness (and discrimination) in rate structures would serve to promote an increase in the amount of industrial recycling, consistent with its environmental and energy goals. By applying, as an exclusive legal standard in this investigation, one which was designed to insure only maintenance of the Status quo in the volume of recyclable traffic, and not one capable of measuring the effect of rate structures in terms of promotion of industrial recycling, the Commission thwarted the purpose of this investigation.
 
 
 24
 It is true that the freight commodity statistics submitted by the railroads and the elasticity studies relied upon by the Commission indicated that the volume of traffic for most recyclables did not decrease in response to previous rate increases. Such evidence, while probative, was hardly conclusive on the question whether the rate structures were impeding development of Increased recycling.[71] The probative value of both types of evidence, moreover, rests entirely on their shared assumption that the rate structures themselves are not unreasonable or unjustly discriminatory.[72] The clear purpose of this investigation, however, was to test the validity of this underlying assumption, one upon which the Commission has been operating for years, not summarily to adopt it. Neither the standard applied by the Commission nor the evidence before it, therefore, was adequate to enable it to conclude, consistent with its mandate, that these rate structures were reasonable.
 
 
 25
 Other deficiencies in the evidence relied upon by the Commission also lead us to conclude that its determinations on these issues are inadequately supported and arbitrary. As the Commission itself acknowledged,[73] a great void exists in this record due to the absence of any evidence concerning the effect of the rate structures on intermodal competition. Given the substantial disparities in the rates applicable to these products, such evidence may well have been material in determining the reasonableness of the rate structures. It may be, for example, that greater equality in the rates would result in diversion of traffic for some or all of these products to competing modes. We need not consider the question whether evidence showing that lower rates on recyclables or higher rates on virgin products would endanger the railroads' ability to carry the traffic might have been sufficient to permit the Commission to approve these rate structures, for we believe the question is one that required an initial determination by the Commission. On the present record, however, there is no basis to enable either this court or the Commission to make an informed determination on the matter.
 
 
 26
 Beyond this inadequacy in the record, we note that the heavy, and often impressionistic, weight[74] given by the Commission to the elasticity studies in this proceeding was plainly unwarranted. The Commission itself admitted the inherent limitation of such studies when used to determine the lawfulness of rate structures.[75] Moreover, its findings in a recent report prepared pursuant to Section 202 of the Regulatory Reform Act[76] to the effect that practically all commodities are demand inelastic to freight rate structures indicate that such studies may have no special significance with respect to the rate structures on recyclable products. We need not, and thus do not, question the validity of the Commission's elasticity studies[77] in order to observe that its approval of the rate structures, based in several instances solely on the results of these studies, was arbitrary in light of their admitted limitations and the findings of this report.
 
 
 27
 Finally, we stress that the Commission was not permitted in this investigation to maintain high rates on recyclables based on general assertions by the railroads concerning the profitability of recyclable traffic and their needs for additional revenues. While we agree with the Commission that it was not required by Section 204 to establish a maximum reasonableness standard applicable to all recycled products, we have no doubt that it was prohibited from approving rate structures unless they were shown to be justified by the transportation characteristics of the particular products. To us, this means that the Commission was compelled by Section 204 to scrutinize the railroads' cost justifications for current rate levels, and that it was insufficient to conclude that the rates were reasonable merely because these levels were profitable for the railroads or because recyclable traffic would continue to move by rail at the railroads' current revenue levels. It may be that, having examined fully the transportation characteristics of the products involved, the Commission might have determined to fix a maximum reasonableness standard for recycled products. And in measuring the appropriate standard the Commission might even have allowed for a reasonable margin of profitability under the rate structures. It is not for us to determine at this stage whether this course, if pursued, would have been proper, or precisely how a maximum reasonableness standard should be measured,[78] since, owing to the Commission's failure to require proof on the transportation characteristics of these products, there is no basis in the record for these determinations. We leave these and the other questions alluded to for resolution by the Commission upon remand.
 
 B. Discrimination Issues
 
 28
 The Commission stated that in determining whether the rate structures were unjustly discriminatory it would be guided by its "traditional standards" under Section 3(1) of the Interstate Commerce Act,[79] and would therefore conduct a four-step analysis. The four steps listed by the Commission were: (1) whether disparities exist between the ratios for recyclable and virgin materials; (2) whether there is "in fact" competition between these materials; (3) whether shippers of recyclables are being injured by the rate disparities; and (4) whether rate disparities are justified by differences in the transportation characteristics of the materials involved.[80] Applying these standards, it concluded that most of the recyclable materials did not in fact compete with their virgin material counterparts, and that shippers of all of the recyclable materials were not competitively injured by existing rate structures. As it had in addressing the issue of the reasonableness of the rate structures, the Commission again avoided an examination of the transportation characteristics of the various products, in this instance by concluding its analysis at the third of these criteria.
 
 
 29
 We agree with the Commission's initial determination to consider the discrimination issues within the framework of the broad prohibitions provided by Section 3(1).[81] Moreover, we concur in the Commission's view that resolution of the discrimination issues in this proceeding required it to consider carefully the competitive relationships between the materials involved. We hold, however, that on this record the Commission's findings of no competition in fact, and no actual competitive injury, were inconsistent with its mandate.
 
 
 30
 Turning first to the Commission's findings of no competition, we note that an obvious concern of Congress in enacting Section 204 was to ensure that the Commission take into account the full competitive relationships between recyclable and virgin commodities. In its general revenue proceedings the Commission had rejected challenges to rate increases, concluding consistently that recyclable and virgin products did not compete for transportation purposes because their competitive relationships were complementary. As in this proceeding, therefore, the Commission applied a standard of competition requiring a showing that recyclable products were substitutable for, rather than functionally equivalent with, virgin products in the manufacture of industrial products. In the view of some members of Congress this standard was unduly narrow and its application by the Commission had resulted in approval of freight rates which retarded rather than promoted industrial use of recycled products. The pertinent passages of the legislative history of Section 204[82] suggest further that these proponents believed application of this standard would frustrate the purpose of the investigation required by the statute.
 
 
 31
 Although the competition standard employed by the Commission was thus an important area of congressional concern, it is evident from both the language of the statute and its remaining legislative history that it was not the main concern leading Congress to require this investigation. As we have previously stated, Congress' major concern was with removal of rate structures which impeded or discouraged development of industrial recycling. In light of this dominant purpose, and especially due to the absence of any statutory reference to the standard of competition to be applied, we are unable to conclude that Section 204 was a legislative directive to the Commission to make positive findings that these products compete for transportation purposes. Nor may we conclude that Congress meant to prescribe any particular standard of competition for application in this investigation. While, as indicated previously, some of the proponents of Section 204 believed that the Commission's investigation should proceed with a presumptive standard of competition based on the functional equivalency of the products in manufacturing processes, Section 204, by its terms, did not enact such a standard.[83]
 
 
 32
 At the same time, giving effect to the specific mandate of Section 204 that the Commission order removal of unlawful rate structures found to discourage industrial recycling after a broad investigation we believe that the Commission was not entitled to apply a competition standard so narrow in scope as to obviate the statutory purpose of its investigation. The lawfulness of the rate structures was not to be governed by the fact that recyclable products had been unable to attain actual competitive status with virgin products under existing rates. Instead, we believe that to warrant dispositive findings of no competition the Commission was required to find that the various products were neither actually nor potentially competitive for transportation purposes. The Commission was therefore required to consider the potential under the rate structures for competitive relationships between recyclable and virgin products, and for competitive injury to shippers. This standard, we might add, not only comports with the Commission's mandate, but is fully consistent with competition standards traditionally applied by the Commission in other discrimination cases.[84]
 
 
 33
 When measured against this standard, the Commission's findings of no competition cannot be sustained. The Commission uniformly required a showing of competition "in fact" to establish discrimination, and concluded in each instance that the recyclable and virgin material counterparts were noncompetitive because they were not actually substitutable in manufacturing processes.[85] It made no findings, and was offered no evidence by the railroads, to the effect that the recyclable materials were not potentially competitive in manufacturing processes, in terms of either their substitutability or their functional equivalency. As we have indicated, it was patently insufficient for the Commission to approve rate structures on recyclables without consideration of such evidence, for to do so was to contravene its mandate in this proceeding.
 
 
 34
 It follows from our discussion that the Commission's alternative findings of no competitive injury also may not be sustained. Based on the same evidence relied upon in determining the reasonableness of the rate structures,[86] the Commission invariably concluded that shippers of recyclables had not suffered actual injury as a result of disparate rate treatment. That evidence, as we have seen, does not support a finding that the rate structures do not present a potential for competitive harm to shippers of recyclables. Instead, it only reflects the responsiveness of the relatively small amount of recyclables shipped to the recent rate increases approved by the Commission. It does not measure the effects of the rate structures on recyclable traffic. Nor does it account for increases in recyclable traffic that may have occurred absent the effects of the rate structures.
 
 
 35
 Unable to discern from this record any support for the Commission's findings on the discrimination issues, we set them aside, leaving for the Commission's determination such questions as may be involved in the assessment of the potential competition and competitive injury presented by these rate structures.[87] Recognizing the breadth of the competition standard the Commission will be required to apply, however, we note that only extraordinary circumstances, not disclosed by this record, will warrant another effort by the Commission which omits consideration, under a Section 3(1) analysis, of the issue whether disparities in the rate structures are justified by differences in the transportation characteristics of these products.
 
 IV
 
 36
 Before concluding, we stress that we are unimpressed with the Commission's attempt to excuse its failure to comply with its mandate by repeated reference to the expedited nature of this investigation. The Commission has for a long time promised, and was finally compelled by Section 204, to resolve the longstanding controversy related to these rate structures. In light of the Commission's general familiarity with the issues involved, and the fact that a significant portion of the extensive record compiled consists of incorporated matter predating its investigation, the proffered excuse is untenable. This is not a case where an agency's determinations are or should be accorded an unusual degree of deference by a reviewing court because of the novelty of the issues and the time constraints within which the agency must operate.[88]
 
 
 37
 On the other hand, although we disagree with the Commission's actions on this record, we also emphasize that our discussion of the standards employed by the Commission to determine the lawfulness of these rate structures, and of the evidence submitted by the railroads, is not intended to set forth our view of the lawfulness of any of the rate structures involved. They may be lawful, or they may not. In either event, it was for the Commission to decide initially based on an adequately supported consideration of the transportation characteristics of the products consistent with its mandate. We have concluded only that the Commission has not done so in this case.
 
 
 38
 Nor, by our disposition, do we mean to intimate any view on the several contentions advanced relating to the measures the Commission should adopt in proscribing either maximum rates on recyclables or maximum rate disparities between recyclable and virgin products. All of these questions we leave to the informed judgment of the Commission, after full consideration of the railroads' justifications for disparities in the rate structures and the effect of the rate structures in terms of their actual and potential impact on the use of recycled products.
 
 
 39
 With these closing admonitions, we conclude that the Commission has not reasonably adhered to its mandate in this proceeding. Accordingly, we vacate the order under review in Nos. 77-1187 and 77-1292 in its entirety, and remand the case for further proceedings consistent with this opinion. We also dismiss the petition for review in No. 77-1193.[89]
 
 
 40
 So ordered.
 
 APPENDIX A
 
 41
 Section 204 of the Railroad Revitalization and Regulatory Reform Act of 1976,
 
 
 42
 P.L. 94-210, 45 U.S.C. § 793 note, provides: INVESTIGATION
 
 OF DISCRIMINATORY FREIGHT RATES FOR THE
 
 43
 TRANSPORTATION OF RECYCLABLE OR RECYCLED MATERIALS
 
 
 44
 Sec. 204. (a) Investigation. The Commission, within 12 months after the date of enactment of this Act, and thereafter as appropriate, shall
 
 
 45
 (1) conduct an investigation of (A) the rate structure for the transportation, by common carriers by railroad subject to part I of the Interstate Commerce Act, of recyclable or recycled materials and competing virgin natural resource materials, and (B) the manner in which such rate structure has been affected by successive general rate increases approved by the Commission for such common carriers by railroad;
 
 
 46
 (2) determine, after a public hearing during which the burden of proof shall be upon such common carriers by railroad to show that such rate structure, as effected by rate increases applicable to the transportation of such competing materials, is just, reasonable, and nondiscriminatory, whether such rate structure is, in whole or in part, unjustly discriminatory or unreasonable;
 
 
 47
 (3) issue, in all cases in which such transportation rate structure is determined to be, in whole or in part, unjustly discriminatory or unreasonable, orders requiring the removal from such rate structure of such unreasonableness or unjust discrimination; and
 
 
 48
 (4) report to the President and the Congress, in the annual report of the Commission for each of the 3 years following the date of enactment of this Act, and in such other reports as may be appropriate, all actions commenced or completed under this section to eliminate unreasonable and unjustly discriminatory rates for the transportation of recyclable or recycled materials.
 
 
 49
 (b) Participation. The Administrator of the Environmental Protection Agency shall take such steps as are necessary to assure that the Commission carries out the requirements set forth in subsection (a) of this section as expeditiously as possible. Such Administrator is authorized to participate as a party in the investigation to be commenced by the Commission under such subsection (a).
 
 
 50
 (c) Research, Development, and Demonstration. The Secretary, in cooperation with the Commission, shall establish a research, development, and demonstration program to develop and improve transport terminal operations, transport service characteristics, transport equipment, and collection and processing methods for the purpose of facilitating the competitive and efficient transportation of recyclable or recycled materials by common carriers by railroad subject to part I of the Interstate Commerce Act.
 
 
 51
 (d) Review. Orders issued by the Commission pursuant to this section shall be subject to judicial review or enforcement in the same manner as other orders issued by the Commission under the Interstate Commerce Act. In all proceedings under this section, the Commission shall comply fully with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 Et seq.).
 
 
 52
 (e) Definitions. As used in this section, the term
 
 
 53
 (1) "recyclable material" means any material which has been collected or recovered from waste for a commercial or industrial use, whether or not such collection or recovery follows end usage as a product; and
 
 
 54
 (2) "virgin natural resource material" and "virgin material" mean any raw material, including previously unused metal or metal ore, woodpulp or pulpwood, textile fiber or material, or other resource which is, or which will become (through the application of technology), a source of raw material for commercial or industrial use.
 
 
 55
 Before WRIGHT, Chief Judge, and SWYGERT* and LEVENTHAL, Circuit Judges.
 
 ON PETITION FOR REHEARING
 PER CURIAM:
 
 56
 As the court indicated in its opinion in this case filed August 2, 1978, Section 204 of the Regulatory Reform Act of 1976 directed the Interstate Commerce Commission to conduct an expedited investigation into the lawfulness of certain rate structures and to order removal of all rates not shown by the railroads to be just, reasonable, and nondiscriminatory. The date of the legislation is February 5, 1976, and Section 204 provides that the investigation be concluded within one year of that date. The investigation culminating in the orders under review here met this timetable, but on August 2, 1978 we vacated the orders of the Commission and remanded the case to the Commission. Thus two and a half years after passage of this "expedited" legislation the Commission is back at Square One.
 
 
 57
 Petitioner in its motion suggests that at the least the Commission should be required to complete proceedings on remand within six months, whereas the Commission and the railroads suggest that the Commission should have an indefinite time to comply with the congressional mandate of expedition.
 
 
 58
 It is this court's view that the congressional mandate of expedition should be respected to the extent possible, given the current delay. Not only should Commission action on remand be expedited, but judicial review thereof, if any, should be as well.
 
 LEVENTHAL, Circuit Judge, dissenting:
 
 59
 I do not believe we should enter an order now specifying a six-month period for completing the investigation required by our opinion. I would agree to an order requiring the ICC to make a report within six months if the investigation has not been completed, indicating the state of affairs and explaining why more rapid progress has not been made. The difference is not cataclysmic for even under the present order, the ICC can return and ask for an extension of time. But the difference is not merely one of form. The court's order presupposes a capacity to judge how long this investigation should take, and I have no basis for a reasoned judgment on that score.
 
 
 
 *
 Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1970)
 
 
 [1]
 We originally consolidated four separate cases, National Ass'n of Recycling Industries, Inc. v. ICC, No. 77-1187; Institute for Scrap Iron & Steel v. ICC, No. 77-1292; National Ass'n of Recycling Industries, Inc. v. ICC, No. 77-1193; and Durbin Paper Stock Co. v. ICC, No. 77-1328, the first two of which are consolidated petitions challenging the report and order here under review. In No. 77-1193 the petition seeks review of a final order of the Commission terminating two general revenue proceedings, Ex Parte No. 318, Increased Freight Rates and Charges, 1976, and Ex Parte No. 336, Increased Freight Rates and Charges, 1977, in which the Commission approved rate increases applicable to recyclable materials, in one instance without preparing a threshold assessment survey, as required by the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4335 (1970), until six months after its approval of the increase, and in the other instance without preparing any environmental statement whatever. Although it raises serious legal questions under NEPA, See Asphalt Roofing Manufacturers Ass'n v. ICC, 186 U.S.App.D.C. 1, 10-12, 567 F.2d 994, 1004-1006 (1977), we have concluded that the petition, filed in advance of the 60-day jurisdictional time limit provided by the Hobbs Act, 28 U.S.C. § 2344 (1970), must be dismissed as premature. See Industrial Union Department, AFL-CIO v. Bingham, 187 U.S.App.D.C. 56, 59-60, 570 F.2d 965, 968-969 (1977). We add, however, that the Commission will be required to reconsider the lawfulness and cumulative environmental impact of the rate increases challenged by this petition because of our disposition herein, in Nos. 77-1187 and 77-1292, vacating the Commission's order. Similarly, the Commission will be required upon remand to reconsider issues presented by the remaining petition in No. 77-1328, which we have decided by separate opinion filed this day. See Durbin Paper Stock Co. v. ICC, 190 U.S.App.D.C. ---, 585 F.2d 543 (D.C.Cir. 1978)
 
 
 [2]
 The order was entered in the Commission's proceeding entitled Ex Parte No. 319, Investigation of Freight Rates for the Transportation of Recyclable or Recycled Materials. Incorporated in this order is the published report and order of the Coordinator in Ex Parte No. 270 (Sub No. 6), Investigation of Railroad Freight Rate Structure Scrap Iron and Steel, 345 ICC 867 (1976)
 
 
 [3]
 See 190 U.S.App.D.C. at ---- & note 42, 585 F.2d at 530 & note 42, Infra
 
 
 [4]
 Petitioners here, the National Association of Recycling Industries (NARI) and the Institute for Scrap Iron and Steel (ISIS), are national trade association representatives of the recycling industries. NARI challenges that part of the Commission's order related to the rate structures on recyclable nonferrous metal, wastepaper, textiles, and rubber. ISIS challenges the Commission's determinations with respect to the rate structures on scrap iron and steel
 
 
 [5]
 As a statutory respondent, 28 U.S.C. §§ 2322, 2342 (1970), the United States, on behalf of the Environmental Protection Agency and the Federal Energy Administration, challenges the Commission's order in its entirety
 
 
 [6]
 Pub. L. No. 94-210, § 204, 90 Stat. 40 (1976). The statute is hereinafter referred to as the Regulatory Reform Act
 
 
 [7]
 Section 204 is set forth in Appendix A of this opinion
 
 
 [8]
 See note 19 Infra
 
 
 [9]
 49 U.S.C. § 1 Et seq
 
 
 [10]
 See New England Divisions Case, 261 U.S. 184, 196-199, 201-203, 43 S.Ct. 270, 67 L.Ed. 605 (1923)
 
 
 [11]
 See United States v. Louisiana, 290 U.S. 70, 73-79, 54 S.Ct. 28, 78 L.Ed. 181 (1933). See also Aberdeen & Rockfish R. Co. v. SCRAP (SCRAP II), 422 U.S. 289, 311-316, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975). In an investigation the railroads have the burden of proving that an increase is just and reasonable, 49 U.S.C. § 15(7) (1970); 49 U.S.C.A. § 15(8)(f) (1977 Pocket Part)
 
 
 [12]
 Commenting on this burden-shifting procedure, we have observed that it is "justified by the need for quick action and the assumption that once a general need has been demonstrated most individual increases will be found just and reasonable." Council of Forest Industries of British Columbia v. ICC, 187 U.S.App.D.C. 147, 151, 570 F.2d 1056, 1060 (1978)
 
 
 [13]
 Complainants who wish to challenge an application of the rate increase may file a complaint with the Commission under § 13(1), 49 U.S.C. § 13(1) (1970), but in any Commission investigation of the complaint under § 15(1), 49 U.S.C. § 15(1) (1970), complainants bear the burden of proving that the rate is unlawful. See Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade, 412 U.S. 800, 812-813, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). Procedures following a similar outline govern rate filings by individual carriers, the other method by which railroads may initiate increases in rates
 
 
 [14]
 The Commission approved rate increases on recyclables by declining to declare them unlawful in the following proceedings: Ex Parte No. 256, Increased Freight Rates and Charges, 1967, 329 ICC 854 (1968); Ex Parte No. 259, Increased Freight Rates and Charges, 1969, 337 ICC 436 (1970); Ex Parte No. 262, Increased Freight Rates and Charges, 1969, unpublished; Ex Parte No. 265, Increased Freight Rates and Charges, 1970, 339 ICC 125 (1971); Ex Parte No. 267, Increased Freight Rates and Charges, 1971, 339 ICC 125 (1971); Ex Parte No. 281, Increased Freight Rates and Charges, 1972, 341 ICC 290 (1973); Ex Parte No. 295 (Sub-No. 1), Increased Freight Rates and Charges, 1973, 344 ICC 589 (1973); Ex Parte No. 303, Increased Freight Rates and Charges, 1974, unpublished; Ex Parte No. 305, RE, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974, unpublished; Ex Parte No. 313, Increased Freight Rates and Charges Labor Costs, 1975, unpublished; Ex Parte No. 318, Increased Freight Rates and Charges, 1976, unpublished; Ex Parte No. 336, Increased Freight Rates and Charges, 1977, unpublished. Together these proceedings yielded rate increases applicable to recyclable materials totalling approximately 70%. In addition to any economic and environmental impacts associated with the rate structures, it may be observed that percentage rate increases themselves, although facially neutral, may have independent impacts, since a rate increases a high rate by a larger absolute amount than it does a low rate
 
 
 [15]
 Id. A review of these proceedings reveals findings by the Commission that rate increases on recyclables are reasonable in part because recyclable products are subject to relative demand inelasticities to freight rate increases. In economic theory, price and product demand elasticities serve to measure buyer response to increased product prices and shipper response to percentage changes in price. The Commission found in these proceedings that increases in transportation prices did not cause significant shifts in demand for recyclable products. For a discussion of the significance of demand elasticity findings, and the elasticity studies relied upon by the Commission in this proceeding, See 190 U.S.App.D.C. at ---- - ---- & notes 71-72, 585 F.2d at 535, 536-537 & notes 71-72, Infra
 
 
 [16]
 See, e. g., Ex Parte No. 281, Increased Freight Rates and Charges, 1972, 346 ICC 88 (1973). The Commission's response to its responsibilities under NEPA has aptly been characterized as "slow," City of New York v. United States, 337 F.Supp. 150, 158-160 (E.D.N.Y.1972), or "tardy," SCRAP II, supra note 11, 422 U.S. at 324, 95 S.Ct. 2336. Although it is established that a general revenue proceeding is itself "a 'major federal action' * * * requiring its own final environmental impact statement so long as the proceeding has a substantial effect on the environment," SCRAP II, Supra note 11, 422 U.S. at 318-319, 95 S.Ct. at 2355, there are indications that the Commission may be continuing to neglect its NEPA responsibilities, both by declining to prepare any environmental statements in support of rate increases applicable to recyclables, See Ex Parte No. 336, Increased Freight Rates and Charges, 1977, supra note 14, and by preparing plainly inadequate ones, Asphalt Roofing Manufacturers Ass'n v. ICC, supra note 1. The Commission, we note, has on occasion indicated views contrary to those set forth in its environmental impact statements. In Ex Parte No. 310, Increased Freight Rates and Charges, 1975, 349 ICC 555, 578 (1975), for example, the Commission stated:
 (I)t remains a basic economic fact that not granting a proposed rate increase for recyclables will generate a degree of positive environmental benefit. This course of action would in the first instance preclude any reduction in the movement of recyclables which may otherwise have been evidenced as a direct response to the increase. Secondly, as (rates on) virgin counterparts are allowed to increase incrementally, recyclables will be placed in a more favorable economic posture. * * * Transportation rates for recyclable materials thus play a part * * * in wide-ranging, multifaceted relationships which inhibit optimal levels of resource conservation and produce or allow concomitant adverse environmental ramifications. To the extent that recyclable rate increases are subjected to holddowns or eliminated entirely, the action would be consistent with established national policies and would provide for a measure of environmental improvement.
 
 
 [17]
 See, e. g., Ex Parte No. 281, 346 ICC 88 (1973). See also Ex Parte No. 306, Implementation of Public Law 93-236, Freight Rates for Recyclables, 346 ICC 408, 411 (1974)
 
 
 [18]
 Commissioner Stafford, former Chairman of the Commission, testified before congressional committees on two occasions to oppose legislation similar to § 204. Based on this testimony, petitioner NARI sought the Chairman's recusal from this proceeding. We do not decide whether the Chairman's refusal to recuse himself was erroneous under the circumstances of this case, See Pillsbury Co. v. FTC, 354 F.2d 952 (5th Cir. 1966), although we note that the views expressed appear to have foreshadowed the Commission's approach to this investigation
 
 
 [19]
 This protracted litigation, challenging the Commission's approval of a general rate increase in Ex Parte No. 281, produced three opinions by a three-judge District Court, SCRAP v. United States, 371 F.Supp. 1291 (D.D.C.1974); 353 F.Supp. 317 (D.D.C.1973); 346 F.Supp. 189 (D.D.C.1972); and two by the Supreme Court, United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); SCRAP II, supra note 11. In SCRAP II the Court finally upheld the environmental impact statement prepared by the Commission for that proceeding. In recognition of the nonfinal and limited nature of the issues decided by the Commission in a general revenue proceeding, the Court determined that the EIS was adequate despite its failure to consider the environmental impact of the underlying rate structures. 422 U.S. at 329, 95 S.Ct. 2336
 
 
 [20]
 Ex Parte No. 270 (Sub-No. 5), Investigation of Railroad Freight Rate Structure Iron Ores, 345 ICC 8 (1976); Ex Parte No. 270 (Sub-No. 6), Investigation of Railroad Freight Rate Structure Scrap Iron and Steel, 345 ICC 867 (1976)
 
 
 [21]
 The controversy surrounding the Commission's approval of freight rates on scrap iron and steel dates as far back as 1960. The initial proceeding involved a complaint alleging that the rate structures violated § 3(1) of the Interstate Commerce Act, 49 U.S.C. § 3(1) (1970), Quoted at note 79 Infra. The Commission dismissed the complaint, ruling that scrap iron and iron ore do not compete. Institute of Scrap Iron and Steel, Inc. v. Akron, C. & Y. R. Co., 316 ICC 55 (1962). In subsequent proceedings the Commission adhered to its finding that these materials do not compete, See, e. g., Ex Parte No. 259, Increased Freight Rates, 1969, 337 ICC 436, 474 (1970); Ex Parte Nos. 265 and 267, Increased Freight Rates and Charges, 1970 and 1971, 333 ICC 125, 207 (1971); Ex Parte No. 281, Increased Freight Rates and Charges, 1972, 341 ICC 290, 413 (1972); Ex Parte No. 295, Increased Freight Rates and Charges, 1973, 349 ICC 250, 279 (1974). On one occasion the Commission did find that competition was shown on the record, and it therefore limited increases in scrap iron rates to those imposed on iron ore. Ex Parte No. 256, Increased Freight Rates, 1967, 332 ICC 280, 331 (1968)
 
 
 [22]
 345 ICC 867, 1199-1200 (1976)
 
 
 [23]
 The environmental impact statement concluded that changes in transportation rates would have negligible short- and long-term impacts on demand for recycled scrap
 
 
 [24]
 Section 204(e) of the Act, Quoted in Appendix A
 
 
 [25]
 Section 204(a)(2) of the Act, Quoted in Appendix A
 
 
 [26]
 Section 204(a)(3) of the Act, Quoted in Appendix A
 
 
 [27]
 Section 204(d) of the Act, Quoted in Appendix A
 
 
 [28]
 Section 204(b) of the Act, Quoted in Appendix A
 
 
 [29]
 Section 204(c) of the Act, Quoted in Appendix A
 
 
 [30]
 II Joint Appendix (JA) 341. The Commission required the parties to submit evidence on seven topics: (1) historical evidence of costs and movement of recyclable and virgin materials; (2) historical evidence on utilization of recyclable materials; (3) sensitivity of recyclable materials to changes in transportation rates; (4) effect of rate changes on individual railroads; (5) effect of rate changes on service to shippers of recyclable commodities; (6) alternative rate structures; and (7) other pertinent evidence not considered elsewhere. Id
 
 
 [31]
 II JA 366. Petitioners and the United States point to the Commission's decision to incorporate the Coordinator's report in Ex Parte No. 270 as an indication that the Commission relieved the railroads of their burden of proving the lawfulness of the rate structures. On the circumstances disclosed by the record, we agree. Ex Parte No. 270 was a nonadversary proceeding which, as the Commission acknowledged, was significantly different from the proceeding under review because of the requirement of § 204 that the railroads maintain the burden of proof. Order at 76. Having acknowledged the differences between these proceedings, however, the Commission proceeded to treat the Coordinator's conclusions as creating a presumption that the rate structures were lawful. See id. at 75-80. While we believe it was appropriate for the Commission to consider the evidence developed in Ex Parte No. 270, it was clearly inappropriate for the Commission to accord presumptive weight to the findings of the Coordinator's report. That report was issued prior to the enactment of § 204 and was therefore superseded by it. Moreover, any approach which treated rate structures as presumptively lawful was inconsistent with the mandate of § 204
 
 
 [32]
 In its reply to the railroads' submissions EPA criticized the railroads' evidence and contended that the railroads had not met their burden of proof. III JA 1299-1318. Among the deficiencies noted EPA found that the railroads "submitted only traffic and revenue data, ignoring the requirement that costs be shown for each of the representative moves"; "failed to respond" with any evidence on five of the seven categories to which the Commission directed their attention; and presented aggregate cost studies which "fail(ed) to reflect the peculiar transportation characteristics of the study commodities." III JA 1303-1306
 
 
 [33]
 See, e. g., Order at 31, 33. In particular, the Commission found that there was no evidence on the effect of the rate structures on intermodal competition, Id. at 49, 100, and that "all respondents failed to show comparisons of results for recyclable commodities with their competing or potentially competitive virgin commodities," Id. at 31. In some instances, where evidence was submitted, the Commission declined to evaluate it. For example, the Commission declined to make a detailed analysis of the cost evidence presented. Id. at 36. Finally, confronted with deficiencies in the railroads' evidence, the Commission repeatedly admonished the shippers for their failure to adduce evidence to support their contentions. Id. at 18, 19, 131, 133
 
 
 [34]
 The Commission computed ratios of revenues to variable costs and revenues to fully allocated costs for relevant movements. Comparison of those ratios demonstrated that the rates for recycled products were uniformly higher than the rates on virgin products. See, e. g., Order at 81, 181, 239, 288, 335y, 362, 403. For example, the Commission's comparison of the average rail transportation charge of iron ore with that of scrap revealed that the average rail rate of scrap was approximately twice that of iron ore in dollars per ton. Id. at 136. Similarly, its comparison of the relative rates for scrap versus commodities for paper, aluminum, copper, zinc, and lead indicated that the rates for paper and aluminum scrap were more than one and a half times the rates for comparable virgin products, and that the rates for lead scrap were three times the rates for virgin lead. Id. at 45. See also id. at 196 (aluminum rates), 295 (zinc rates), 296 (lead rates)
 
 
 [35]
 The majority of the revenue-cost ratios computed by the Commission for recycled products exceeded the national average ratio of 131.8 for products moving by rail. See, e. g., Order at 70, 81, 239, 288, 335y, 362, 403
 
 
 [36]
 The record indicated, for example, that eastern and southern railroads carry virgin pulpwood and wood chips at rates substantially below their variable costs, III JA at 995-1000, 1007, 1008, 1009-1020, at the same time that recycled wastepaper and textile wastes were transported at rates significantly in excess of such costs. I JA at 326, 337
 
 
 [37]
 Order at 70
 
 
 [38]
 The freight commodity statistics measured the volume of recyclable traffic carried by the railroads over several years and showed in most instances that the volume of recyclable traffic did not decrease during years of rate increases
 
 
 [39]
 The Commission relied to a great extent on the so-called Gellman elasticity study, submitted by the railroads, as well as on the results of elasticity studies analyzed in the environmental impact statement. Those studies revealed that demand for recyclable products had been inelastic to rate increases in recent years
 
 
 [40]
 The environmental impact statement, analyzing the economic and environmental impacts of freight rates on each recycled product, concluded that freight rates have not had a significant effect on the use of recycled products, and therefore that the Commission's action has no significant impact on the quality of the environment. Order at 66-67
 
 
 [41]
 In a few instances the Commission found that the rates for recyclable products were unreasonably high and accordingly ordered those rates reduced. Order at 425
 
 
 [42]
 Order at 425b-d (Commissioners Christian and O'Neal, dissenting), 425e (Commissioner Clapp, dissenting)
 
 
 [43]
 Petitioner NARI also appears to challenge the adequacy of the environmental impact statement prepared by the Commission. We do not address this issue, since we find that the challenged order is not reasonably consistent with the mandate of § 204
 
 
 [44]
 Petitioners construe § 204, among other things, as a congressional declaration that recyclable and virgin commodities compete for transportation purposes. The United States disagrees with this interpretation, arguing instead that § 204 was a mandate to the Commission to weigh environmental goals more heavily than traditional transportation policy criteria. For the reasons discussed herein, we adopt neither of these views
 
 
 [45]
 Congress did not announce its general environmental goals and its particular emphasis on promotion of the recycling industry solely by its enactment of § 204. NEPA, in requiring all federal agencies to determine and justify the effect of any major federal action upon the nation's environment, originally directed such agencies to promote the "maximum attainable recycling of depletable resources." 42 U.S.C. § 4331 (1970). In 1970 Congress next enacted the National Materials Policy Act, Pub. L. No. 91-512, §§ 201-206, reaffirming the national policy to conserve virgin resources and enhance recycling of those materials. This Act created the National Materials Policy Commission which, after three years of investigation, submitted a final report to Congress in June 1973 recommending that the "Federal Government take the necessary steps to correct the existing freight rate differentials between secondary and primary materials." National Com'n on Materials Policy, Final Report to Congress 4D-18 (1973). This report followed a similar report prepared by the Environmental Protection Agency, pursuant to the Solid Waste Disposal Act, 42 U.S.C. § 3251 Et seq. (1965), which identified inequitable freight rates as a federal disincentive to maximum recycling. Environmental Protection Agency, Report to Congress on Resource Recovery (1973). Subsequently Congress enacted the Energy Supply and Environmental Coordination Act of 1974, Pub. L. No. 93-319, requiring the Federal Energy Administration to conduct and submit to Congress a study of "alternative requirements, incentives or disincentives for increasing industrial recycling and resource recovery." Pub. L. No. 93-319, § 8(a)(2). The study ultimately prepared by the FEA concluded that the Commission's shipping rates and regulations were a regulatory restraint to industrial energy conservation. Specifically, the report found that "shipping rates that discriminate against transport of recycled materials in favor of virgin materials are a significant barrier to increased recycling." Federal Energy Administration, Office of Conservation and Environment, Report to Congress: Energy Conservation Study 157 (1974). Finally, in 1976 Congress enacted the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 Et seq., creating the National Resource Conservation Committee to ensure that barriers to recycling and energy conservation are eliminated. 42 U.S.C. § 6982(j). Such legislation, based on years of study of the problems of the recycling industry, evinces an evolving congressional plan to conserve resources and to promote recycling of depletable materials. Section 204 must therefore be viewed as an integral part of this congressional design. See also text and notes at notes 60-61 Infra
 
 
 [46]
 Among the environmental and energy goals thought to be served by promotion of industrial recycling are: national energy savings, See Federal Energy Administration, Office of Conservation and Environment, Supra note 45; conservation of depletable natural resources, See National Com'n on Materials Policy, Supra note 45; reduction of industrial air and water pollution and increasing water utilization, See Environmental Protection Agency, Supra note 45; and disposal of solid wastes, See National League of Cities U. S. Conference of Mayors, Cities and the Nation's Disposal Crisis (1973)
 
 
 [47]
 Pub. L. No. 93-236, § 603 (1973)
 
 
 [48]
 Id
 
 
 [49]
 SCRAP v. United States, 371 F.Supp. 1291, 1305-1306 (D.D.C.1974) (three-judge court), Rev'd on other grounds, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1974)
 
 
 [50]
 See Ex Parte No. 306, Public Law 93-236, Freight Rates for Recyclables, 346 ICC 408 (1974). The Commission promulgated rules for filing complaints alleging discrimination against recyclable materials. Dissenting on the ground that these rules did not meet the intent of § 603, Commissioner O'Neal observed:
 The lack of specific requirements in the statute is read by the majority * * * to indicate that the Commission need not undertake a broad investigation. But the Congress has indicated that this is an area of sufficient congressional concern to warrant a statutory message to the Commission. * * * Congress wanted the Commission to do something more than merely reaffirm that upon the filing of a formal complaint a remedy for discrimination exists at the ICC.
 
 
 [346]
 ICC at 414 (Commissioner O'Neal, dissenting)
 
 
 [51]
 The Commission approved seven successive rate increases applicable to recyclable materials totalling approximately 38% Over a two-year span. Ex Parte No. 295, 344 ICC 589 (1974); and subsequent proceedings cited at note 14 Supra
 
 
 [52]
 S. 1744, 94th Cong., 1st Sess. (1974); H.R. 12536, 93d Cong., 2d Sess. (1974). See also S. 2753, 93d Cong., 1st Sess. (1973)
 
 
 [53]
 Id
 
 
 [54]
 S. 2753, Supra note 52
 
 
 [55]
 The bills which evolved into the Regulatory Reform Act originated as H.R. 10979, 94th Cong., 1st Sess. (1975), and S. 2718, 94th Cong., 1st Sess. (1975)
 
 
 [56]
 See Ann Arbor R. Co. v. United States, 281 U.S. 658, 668-669, 50 S.Ct. 444, 74 L.Ed. 1098 (1930) (statute directing the Commission to investigate rate structures to determine whether rates were unreasonable or unjustly discriminatory, and to achieve the lowest possible lawful rates, did not effectuate substantive changes in existing law)
 
 
 [57]
 While formally acknowledging the need to consider "all factors related to the transportation of commodities," Order at 70, the Commission proceeded to focus exclusively on one or two of those factors, 190 U.S.App.D.C. at ---- - ----, 585 F.2d at 535 Infra, and to criticize the recycling industry for failure to adduce any other evidence, See note 33 Supra
 
 
 [58]
 Respondent's brief at 46 ("the burden of going forward with the evidence (shifted to the shippers) after the railroads carried their burden")
 
 
 [59]
 See note 12 Supra
 
 
 [60]
 S. Rep. No. 94-499, 94th Cong., 1st Sess. 51 (1975)
 
 
 [61]
 121 Cong. Rec. 38450-38451
 
 
 [62]
 The Commission stated that it was required to consider the railroads' needs for revenues before ordering removal of the unlawful rates. Order at 74. We believe the Commission was authorized to consider financial impacts of particular rate structures on the railroads in determining the lawfulness of the rates, but was not entitled to give this factor the predominant weight that has been suggested in order to approve otherwise unlawful rate structures. Section 204, in our view, directed the Commission to order removal of unlawful rate structures, regardless of their effect on the railroads' revenue levels
 
 
 [63]
 Atchison, Topeka & Santa Fe R. Co. v. ICC (Market Dominance), 188 U.S.App.D.C. 360, 363, 364, 580 F.2d 623, 626-627 (D.C.Cir. 1978)
 
 
 [64]
 We note that the Commission made no formal findings with respect to the existence of rate disparities, made no attempt to analyze cost evidence with respect to movements of the materials investigated, and did not require the railroads to adduce proof on the subject of potential competitive injury to shippers resulting from the rate structures. In effect, therefore, the Commission performed a circuitry: it substituted its environmental analysis of the impact of past rate increases for an economic analysis of the alleged unreasonableness and unjust discrimination in rate structures, and concluded that the rate structures were lawful because rate increases had not, in its view, resulted in actual harm to shippers of recyclables. Section 204 directed the Commission to address, and require proof from the railroads on, the issues whether the rate structures were unreasonable or unjustly discriminatory not to conduct a shell game
 
 
 [65]
 Order at 67
 
 
 [66]
 Among the many variables the Commission has considered in the process of assessing the reasonableness of rates are: cost of service, value of service, the existence Vel non of competition, the transportation characteristics of the commodity (weight, size, density), the anticipated volume of shipments, the distance of the haul, the availability of return loads, the economic status of the industry, the rate level required to move the traffic, the threat of intermodal competition, and comparisons with established rates for comparable shipments in the territory involved. See, e. g., Burlington Northern, Inc. v. United States, 555 F.2d 637, 640 (8th Cir. 1977)
 
 
 [67]
 Order at 70
 
 
 [68]
 Id. at 74
 
 
 [69]
 Chicago Board of Trade v. Illinois Central R. Co., 329 ICC 529, 533 (1967) (reasonableness of rates may be determined "in relation to any other satisfactory standard which permits (the Commission) to measure and determine the factual question presented")
 
 
 [70]
 Burlington Northern, Inc. v. United States, 549 F.2d 83, 88 (8th Cir. 1977)
 
 
 [71]
 Data showing a constant or even a growth in consumption of recycled materials despite rate increases do not necessarily show that freight rates are inconsequential. As indicated by the Commission in previous proceedings, See note 16 Supra, consumption might have been materially higher or lower had rates been different in the years of rate increases. Even in this proceeding the Commission has effectively admitted that only a multi-variate analysis would adequately enable it to isolate the effect of transportation costs on consumption of recycled products. Given these shortcomings, we doubt whether such data alone would warrant the dispositive findings made by the Commission under any circumstances. See text and notes at notes 75-77 Infra
 
 
 [72]
 Order at 76 ("Conclusions on elasticity are limited to the range of prices experienced in the data base."). Since the range of prices used in the Commission's data base included only those associated with the rate increases, the validity of its conclusions with respect to the effects of rate structures necessarily depends on an assumption that the price ranges are identical with, or significantly representative of, those experienced throughout the rate structures
 
 
 [73]
 Order at 100
 
 
 [74]
 See, e. g., Order at 151 (fly ash); 219, 220 (aluminum scrap); 221 (aluminum ash); 222, 225 (aluminum residue); 261 (copper scrap); 262, 264 (copper matte); 305, 307 (lead scrap); 309-310 (zinc scrap); 318 (tin scrap); 325, 333-334 (waste paper); 351-352 (textile wastes); 371 (cullet); 398-399 (reclaimed rubber); 402-406 (bakery refuse); 414-415 (steel containers)
 
 
 [75]
 The Commission observed: "few products * * * have the same demand elasticity for the entire range of prices. Demand may be inelastic for a limited range of prices and become elastic above that range." Order at 54. The Commission also stated that "aggregate studies only describe the collective impact of rate changes for a broad category of commodities. They give no indication of how individual shippers are affected." Id. at 56. In other words, the Commission acknowledged that these studies are relevant only as a general proposition, and only for the specific period of time investigated. The conclusions thus have limited relevance to the effects of high rate structures on particular products
 
 
 [76]
 Section 202(g) of the Regulatory Reform Act, 49 U.S.C. § 1 note. The Commission found that, particularly with respect to most manufactured commodities, "the freight rate represents such a small percentage of the total delivered price of the product * * * that major increases in transport prices will not cause significant product demand shifts but may affect modal choice." Interstate Commerce Commission, The Impact of the 4-R Act Railroad Ratemaking Provisions 102 (1977)
 
 
 [77]
 Petitioner NARI, challenging both the accuracy and the relevance of the Commission's elasticity studies, appears to contend that under no circumstances may the Commission consider such evidence in determining the lawfulness of the rate structures. Petitioner NARI's supplemental brief at 5-6. We disagree. Where the Commission erred here is that it accorded virtually dispositive weight to evidence, having by its own admission limited significance to a determination of the issues presented, without fully considering other evidence directly relevant to those issues. The Commission is not prohibited from taking such evidence into account, provided it otherwise adheres to its mandate by examining traditional factors related to the transportation of commodities, and it articulates a rational basis for attributing significance to it
 
 
 [78]
 Petitioner NARI devoted a substantial portion of its arguments to the contention that existing rate structures, when measured against guides applied in other rate situations, are unreasonable. In support of its position it relied on: (1) the Commission's 1972 Burden Study, Interstate Commerce Commission, Rail Revenue Contribution by Commodity and Territory for the Year 1972, Statement No. 153-72; (2) the Commission's recently promulgated market dominance regulations, 49 C.F.R. § 1109.1, 41 Fed.Reg. 44183 (1976); and (3) the Commission's recent decision in San Antonio, Texas, Acting By and Through Its City Public Service Board v. Burlington Northern, Inc., Docket No. 36180
 The essence of NARI's argument appears to be that the existing rate structures are unreasonable Per se because they exceed standards announced in these proceedings by a wide margin. In its Burden Study, for example, the Commission found that the average cost-revenue ratio on national traffic was 131.8%. A large number of the ratios developed by the Commission in this proceeding exceeded this figure. See note 35 Supra. Similarly, many of the ratios were higher than the 160% Ratio announced in the Commission's market dominance regulations as creating a rebuttable presumption that a carrier possesses market dominance over the service rendered under a proposed rate. 49 C.F.R. § 1109.1(g)(2). Finally, although the Commission did not analyze cost evidence in this proceeding, it appears that the rate structures on many of the recyclable products would be invalid under the Commission's San Antonio decision, in which it prescribed rates approximating the cost levels of the service therein involved.
 The Commission contends that none of the standards suggested by NARI compel a finding of unreasonableness, or should be used to set a standard of maximum reasonableness, because they were not intended to establish the reasonableness of particular rates. Respondent's brief at 58-64. Moreover, the Commission asserts that the question of the reasonableness of the rate structures should not be dependent upon a cost standard, at whatever level such standard might be set. Id. at 58-59. Since costs alone have never been held to determine maximum reasonable rates, See, e. g., General Motors Corp. v. New York Central R. Co., 311 ICC 622, 625, Aff'd, 207 F.Supp. 641, 648 (E.D.Mich. 1962), Aff'd per curiam, 324 F.2d 604 (6th Cir. 1973); United States v. Great Northern R. Co., 293 ICC 341, 345 (1954); Morrison-Knudson Co. v. Missouri Pacific R. Co., 308 ICC 205, 209 (1959), we agree that the Commission was neither required to limit its consideration to this criterion solely, nor compelled to establish a maximum standard of reasonableness based exclusively on cost-derived standards. Granting this much, however, does not lead us to conclude that the Commission was entitled, as it has, to ignore any consideration of costs. Section 204, as we have stated, required it to determine the lawfulness of the rate structures based on a complete investigation of the transportation characteristics involved.
 Nor does our rejection of NARI's argument inevitably support the view that the Commission was not authorized in this investigation to establish a maximum standard of reasonableness. In this regard, we note that the market dominance regulations promulgated by the Commission under the Regulatory Reform Act were designed to assist it in focusing on areas where maximum rate regulation is needed in the public interest. It may be that during the course of an investigation conducted consistent with its mandate under § 204 the Commission would decide that some equivalent standard would serve a similar purpose concerning rates on recyclables.
 
 
 [79]
 It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description
 49 U.S.C. § 3(1) (1970).
 
 
 [80]
 Order at 72. The Commission thus introduced a novel element, competition in fact, into its traditional § 3(1) inquiry. In typical § 3(1) cases the Commission has required a showing that a party is "competitively injured, actually or potentially." Id. at 72 n.20. See also Chicago Board of Trade v. Illinois Central R. Co., 344 ICC 818, 831 (1973)
 
 
 [81]
 The Commission's initial position was that it "should not restrict" itself to viewing its investigation under § 2 of the Act, 49 U.S.C. § 2 (1970), which prohibits unjust discrimination between like kinds of traffic under substantially similar circumstances and conditions, but also should consider the prohibitions under § 3(1). Order at 71. To the extent that the Commission's subsequent application of § 3(1) standards may have reflected a view that it was not required to examine the transportation characteristics of these products, See id. n.19a, this determination was inconsistent with its mandate. We note, however, that according to its statement of the criteria applied under § 3(1), the Commission was required to consider whether differences in the transportation characteristics justified disparities in ratios. Id. at 72
 
 
 [82]
 Senator Tunney, the sponsor of the amendment to § 204 placing the burden of proof upon the railroads, stated that "the investigation must proceed with an articulation of a presumptive standard of competition. For the purpose of this investigation, the Commission should consider recyclable and virgin materials to be competing if they are functionally equivalent in the manufacturing stage." 121 Cong.Rec. 38451 (1975). In a similar vein, the Senate Commerce Committee Report stated: "(T)he record * * * indicates that the Commission may not be taking into account the full competitive relationship * * *. A reexamination of that relationship will be necessary if this investigation is to achieve its goal." S. Rep. No. 94-499, 94th Cong., 1st Sess. 51 (1975)
 
 
 [83]
 To hold, as petitioners suggest, that the Commission was required by § 204 to find or assume that recyclable and virgin commodities compete would require us to give controlling weight to the remarks of Senator Tunney. We decline to do so not only because they are not supported by the language of § 204, but also because they were not adopted in the Senate Commerce Committee Report, which indicated instead that the Commission should "reexamine" competitive relationships consistent with the investigation's purpose of removing unlawful impediments to the movement of recycled materials. See note 82 Supra. See also Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1970); American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 15, 365 F.2d 939, 948 (1966)
 
 
 [84]
 Baltimore & Ohio R. Co. v. United States, 391 F.Supp. 249, 259 (E.D.Pa. 1975) ("It was the potential for discriminatory treatment inherent in the practice which the Commission found to be violative of Sections 2 and 3(1)."). See Chicago Board of Trade v. Illinois Central R. Co., supra note 80. See also Chicago & Eastern Illinois R. Co. v. United States, 384 F.Supp. 298, 300-301 (N.D.Ill. 1974) (three-judge court), Aff'd, 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975)
 
 
 [85]
 See, e. g., Order at 106, 220-221, 398
 
 
 [86]
 See text and notes at notes 71, 74-76 Supra
 
 
 [87]
 There are indications on this record that some, if not all, of the rate structures present potential for competitive harm to shippers. See, e. g., Order at 132 ("price and availability of raw materials" found to be one factor affecting a manufacturer's determination to build a scrap-consuming electric furnace). In order to meet their burden of proof on this issue, the railroads should at a minimum be required to survey existing and potential users of recyclables to determine whether reductions in rates would encourage them to purchase more or make additional use of recyclable materials
 
 
 [88]
 Cf. Market Dominance, supra note 63, 188 U.S.App.D.C. at 363, 364, 580 F.2d at 629-630; American Public Gas Ass'n v. FERC, 190 U.S.App.D.C. ---, ---, 587 F.2d 1089 (D.C. Cir. 1978) (Per curiam )
 
 
 [89]
 See note 1 Supra
 
 
 *
 Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1976)